**People of the State of Illinois, Plaintiff-Appellee, v. Charles Kelly, Defendant-Appellant.**

**Gen. No. 50,953.**

First District, First Division.

July 11, 1966.

Ira Bell, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Morton E. Friedman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

Two indictments, charging armed robbery, were returned against defendant, Charles Kelly, and James Randall. Randall pleaded guilty and testified against defendant Kelly in a jury trial, in which the two indictments were consolidated. Defendant was found guilty on both in-

dictments and was sentenced to the penitentiary for a period of four to eight years on each indictment, with the sentences to run concurrently.

On appeal, defendant Kelly contends the court committed prejudicial error (1) "when it denied defendant the right to cross examine a confessed accomplice with regard to whether the confessed accomplice had pending before the court an application for probation"; and (2) "when it refused to give the jury instructions explaining the law applicable to accomplice testimony."

The five witnesses who testified on behalf of the State included two victims of the alleged offenses, two arresting police officers, and the accomplice Randall, who, at the time he testified, had previously pleaded guilty to the indictments and had an application for probation pending before another trial judge.

Randall testified that on the morning of November 2, 1962, defendant Kelly, Randall and a third person named Wallace planned to hold up Spike's Tavern at 4308 South Ashland Avenue. Wallace drove defendant Kelly and Randall to Spike's Tavern and, in the course of the ride, Wallace gave Randall a gun. It was agreed that Randall would go into the tavern first and force the owner into the washroom in the tavern. Thereafter, defendant Kelly would come into the tavern and help Randall complete the holdup, since Kelly was familiar with where the money was kept. The driver was to stay in the car, and the money was to be split evenly. The reason for Randall going into the tavern first was because defendant Kelly said he was known by the tavern owner.

When they arrived near Spike's Tavern, Randall got out of the car and went into the tavern and saw the owner and two patrons. Randall ordered and drank two bottles of beer. He then walked toward the door and pulled out his revolver and told the two patrons and the owner that it was a "stick up." He ordered them into

the washroom, closed the door and asked for their money. The owner gave his bankroll to Randall, and one of the patrons gave him a handful of change. Randall dropped the owner's wallet, and as Randall was reaching down to pick it up, the patrons grabbed him and his revolver. While they were wrestling for possession of the revolver, the owner ran out of the washroom to the bar to get his revolver, and as he was going behind the bar, Randall heard the owner holler, " 'Say, there is another one,' and I turns and looks and I get a glimpse of Kelly going out the door." On further examination, Randall identified Kelly as the man "who rode in the car and who you saw going out of the tavern."

After defendant Kelly left the tavern, the tavern owner and the patrons captured Randall, and he was turned over to the police shortly thereafter.

The tavern owner, Stanley Howaniec, testified that after he served Randall a beer, he went to a window and noticed defendant walk by. When he turned around, Randall was pointing a gun at him and ordered him and the patrons into the washroom. While they were in the washroom, Randall demanded their wallets, and as Randall was examining Howaniec's wallet, Chester Mack, one of the patrons, pushed him toward the door, and "the door opened, and Charles Kelly over there was behind the bar. He jumped out from behind the bar. . . . he ran out the door, I ran behind the bar and got my gun and I fired four or five shots in the air, and a motorcycle policeman come in. I told him, 'Got a stick-up man in there.' Then he told me to call the police." He saw defendant Kelly enter the car and drive away. He further testified that he had seen Kelly before in the tavern, "the last few months he was coming in pretty regular on Friday night," and that defendant "jumped out in front of the bar and was facing the gun toward us . . . ."

145

Chester Mack, one of the patrons, testified that he saw Randall come into the bar and order two bottles of beer. When he got the second bottle of beer, he turned around and said, "This was a stick up, go in the ladies' washroom . . . . We got in there, he asked me for my money, so I gave him $10. . . . So he took the wallet [Howaniec's]. As he was looking through the wallet I made a grab for the gun, and Stanley and Louie helped me, and we overpowered him. At the same time the door opened up in the washroom and we could see this man now known as Kelly. I could see him coming from behind the bar, and he stood in the doorway. The door was opened in the tavern, and he was pointing a gun at us." He further testified as to the overpowering of Randall and his subsequent arrest.

Defendant testified that on the morning of November 2, 1962, he and Wallace met Randall at Randall's home, and that thereafter Wallace, Randall and defendant drove to a restaurant on 43rd Street, where they had coffee. Wallace, Randall and defendant Kelly then drove to the College Inn, where Randall got out of the car to make an application for a job. Thereafter, defendant and Wallace drove to a service station, where they purchased gasoline. At the same time they also attempted to purchase cigarettes, but the service station did not have any cigarettes. At defendant's suggestion, Wallace and defendant then drove to Spike's Tavern, in order to get cigarettes for 21 cents a package. Defendant walked into Spike's, rapped on the bar for service, and "as soon as I pecked on the bar they tumbled out the bathroom, Spike, Randall, and the other two fellows. . . . Yes, that is when I left." Defendant took nothing from the tavern.

Defendant further stated that on the night of November 1, he spoke by telephone with Randall, and at that time advised him that defendant thought he had a job for Randall. Defendant told Randall that defendant had

146

to go to Wilson & Company the next morning because Wilson & Company had called defendant back to work. Defendant told Randall that he would see him the next morning. Defendant denied having any discussion with Randall concerning the robbery of Spike's Tavern or any other robbery.

Defendant also testified that he had been convicted of a felony in January 1962, "assault with a robbery charge." He pleaded guilty and got five years' probation and was on probation on November 2, 1962.

On cross-examination, defendant testified that he had been going into "Spike's Tavern" for about three years, "on Friday nights, payday," and had seen the tavern owner cash checks, and when Wallace drove the car "from Randall's house to Spike's Tavern at 4308 South Ashland Avenue," defendant sat in the back seat and Randall and Wallace sat in the front seat. In response to the question, "What were you and Randall talking about in that car from the time you left Randall's house until he got out of the car at the home—in the vicinity of 4308 South Ashland Avenue?" defendant answered, "Talking about girls, jobs, and things like that." While he was in the tavern and the men, including Randall, came out of the washroom, he testified, "Yes, I seen a gun. They all had their hands on it. I don't know who had the gun, but all had their hands on it."

Defendant's principal contention of reversible error is grounded on the assertion that Randall's testimony was crucial to the State's case against defendant, and "defendant was prevented by the Court from inquiring as to whether Randall, an admitted accomplice and participant in the commission of a felony, had an application for probation pending with the Court."

The record shows that when Randall was cross-examined by the defense, he was asked, "You have an application for probation?" The court sustained the objec-

147

tion of the State, and in a conference between court and counsel, outside of the presence of the jury, the trial court finally said, "The Court answers you this way. The jury is not permitted to speculate whether the Court is going to give this defendant probation or time in jail. The Court will allow you to put in evidence that the witness on the stand now has pleaded guilty and is awaiting sentence. Never mind the probation. . . . Waiting sentence does not mean he is going to be put on probation or he is going to be sent to jail. It is all speculative, and the jury has no right to speculate."

The record further shows that in the presence of the jury, and on the resumption of the cross-examination of Randall, Randall was asked, "Did either of them [Assistant State's Attorneys] tell you what sentence they would recommend in return for your testifying in this case against Mr. Kelly?" The State, after the court sustained its objection, withdrew the objection, and on the question being repeated, the witness answered, "No, they didn't." Further cross-examination on this question of probation resulted in the court stating in the presence of the jury, "Well, strike the word probation and don't talk about probation." Defendant's motion for a mistrial was denied. The court permitted further cross-examination of Randall as to the two State's Attorneys with whom he spoke prior to the trial and during the trial, but sustained further questions as to what consideration he was to receive for testifying, the basis of the State's objection being, "This man already said he was going to get no consideration." Prolonged cross-examination in this area brought the further remark from the trial court, "He has no right to assume he is going to get probation because that is something for the Court to decide."

The authorities cited by defendant on this contention include People v. Maggio, 324 Ill 516, 155 NE 373 (1927), where the court said (pp 525, 529) :

"It is apparent that the conviction depends in large measure upon the relative credibility of Backley and the plaintiff in error,—the former a co-defendant though not on trial, a confessed accomplice guilty of the murder and an active participant in the crime, . . . . If Backley was granted immunity from punishment for the crime in consideration of his testimony, every person accused of the crime against whom he testified had the right to show that he had been granted such immunity, . . . in order that the jury might, in weighing his testimony, draw such inferences from it as were proper, considered in connection with all the circumstances of his guilt and of the promise of immunity.

"The testimony of an accomplice is competent evidence, and, although uncorroborated, may be sufficient to sustain a conviction if it is of such a character as to prove guilt beyond a reasonable doubt. It is always, however, subject to grave suspicion and should be acted on with great caution. . . . A defendant against whom an accomplice in the crime testifies is therefore entitled to cross-examine such witness and interrogate him freely as to his motives, bias and interest, his relation to the crime and the persons connected with it, and any matters which tend to impeach his fairness or impartiality. The jury were denied the information that Backley had been promised freedom in consideration of his testifying against DeFranco, and the State's attorney presented him as being what he professed,—a defendant who had offered himself as a witness without promise of immunity or upon any consideration but a desire to tell the truth, and who had voluntarily undertaken to testify as a witness for the People solely from such desire to tell the

149

truth and accept such punishment as the court might see fit to impose, without any restriction."

In People v. Hermens, 5 Ill2d 277, 125 NE2d 500 (1955), the court said (pp 285, 286):

> "At common law the uncorroborated testimony of an alleged accomplice was sufficient to warrant a conviction if it satisfied the jury beyond a reasonable doubt. This rule has always been followed and has frequently been pronounced in Illinois. . . . This court has also said that where it appears that the witness has hopes of reward from the prosecution, his testimony should not be accepted unless it carries with it absolute conviction of its truth."

As to this contention, the remarks made in People v. Durand, 321 Ill 526, 152 NE 569 (1926), are in point. There, the Supreme Court, after stating that the widest latitude of cross-examination of an accomplice ought to be permitted, and that the jury are entitled to know what inducements have been held out to the accomplice as a reward for his assistance to the prosecution and anything else that in any way affects his credibility, said (p 530):

> "In this case the court unduly restricted the cross-examination of Miller and Patterson, and if the conviction rested upon the uncorroborated testimony of these accomplices this error would require a reversal of the judgment. Under the circumstances, however, we think the error was harmless. The testimony of the accomplices was fully corroborated by other facts and circumstances which point to the guilt of plaintiff in error. His explanation of the possession of this stolen property is not convincing and evidently the jury did not give it any credit."

In the instant case, we think it can be reasonably argued that the court somewhat restricted the cross-examination of Randall, but the prolonged cross-examination in this area, together with the statement by Randall that the State's Attorneys did not tell him what sentence they would recommend in return for his testimony against defendant, resulted in a fair interrogation of Randall "as to his motives, bias and interest, his relation to the crime and the persons connected with it, and any matters which tend to impeach his fairness or impartiality." We also note that defendant's conviction does not depend on the testimony of Randall. Defendant's participation in the robbery was fully corroborated by two victims of the robbery. We find no reversible error here.

We consider next the refusal of the trial judge to give the following instruction tendered by the defendant:

> The Court instructs the jury that when determining the evidentiary worth of the testimony of an accomplice, the jury must not judge that testimony as it would that of another type witness. The jury must look upon accomplice testimony with great suspicion, and act upon it with great caution, and unless the jury is satisfied from the accomplice testimony and all of the circumstances in evidence of the guilt of the defendant beyond all reasonable doubt, it is the sworn duty of the jury to return a verdict of not guilty.

The authorities cited in support of this contention include People v. Rongetti, 338 Ill 56, 170 NE 14 (1930), where the Supreme Court said (p 65):

> "The jury are not to pass upon the testimony of an accomplice as 'they do upon any other witness,' but they are to consider it as subject to grave sus-

151

picion and must act upon it with great caution, and only when they are satisfied from the testimony of such accomplice and all the circumstances in evidence that the guilt of the defendant is proven beyond a reasonable doubt will they be warranted in convicting a defendant *on such testimony.*" [Emphasis added.]

■ The State argues "the instruction tendered by defendant forbids the jury to convict on the weight of the accomplice's testimony alone, but requires some other corroboration. Such is clearly not the law of Illinois which allows conviction upon the testimony of an accomplice even if not corroborated. People v. Rudnicki, 394 Ill 351 (1946)."

The record shows that in the conference held by the court with counsel, to settle the instructions, the State, in objecting to the instant instruction, objected to the following part of the last sentence "unless the jury is satisfied from the accomplice testimony and all of the circumstances in evidence of the guilt of the defendant beyond all reasonable doubt, it is the sworn duty of the jury to return a verdict of not guilty." The court suggested that part of the sentence be taken out of the instruction, and as defendant's counsel refused to do so, the court refused the instruction for that reason, and no substitute instruction was offered.

The instructions given to the jury did include an instruction on the credibility of witnesses, which instructed the jury that it might take into consideration "the opportunities of the several witnesses for knowing the things about which they testify, their age, discretion and experience; their bias or lack of bias; their interest, if any, in the result of the trial, the probability or improbability of the truth of their several statements; the relation which they bear to either side and the extent to which any witness is contradicted or corroborated by

152

any other credible evidence, if at all, and any evidence that tends to shed light on his or her credibility."

■■ Although we think it was error to refuse the proffered instruction of defendant, we believe the jury was sufficiently instructed in this case. This is not a conviction which rests upon the uncorroborated testimony of the accomplice. The testimony of the two victims of the offense was sufficient to identify defendant beyond a reasonable doubt as being at the scene, behind the tavern bar, and with a gun.

In the instant case, defendant chose to explain his presence in the tavern at the time of the robbery, and statements made in People v. Lane, 29 Ill2d 326, 194 NE 2d 272 (1963) apply here. There, the court said (pp 329, 330, 331):

> "We have frequently stated that the uncorroborated testimony of an accomplice is attended by infirmities which require the utmost caution, yet we have also held that such testimony is sufficient to convict if it satisfies a court or jury, as the case may be, beyond a reasonable doubt. . . . Furthermore, the accomplice testimony of Woods was substantially corroborated by the defendant's own testimony as to his acts on the night of the crime, by defendant's conduct as observed by the victims of the robbery and the police, and by the defendant's unexplained possession of the robbery weapons. Except for his denial of participation in the robbery, the defendant's testimony as to his actions on the night of the crime is almost identical with the description of his conduct by Woods. He admitted driving Woods and Blevins to the scene of the robbery and driving with them shortly thereafter when the money taken from him was admittedly returned. . . . The defendant's own testimony was implausible and contradictory. We have held that

153

when a defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story or be judged by its improbabilities."

Defendant's testimony fairly shows that he went to the tavern with both Randall and Wallace. He admitted being in the tavern, seeing the struggle for Randall's gun, and hearing shots fired, yet he proceeded to the car and drove away with Wallace. He testified that when they heard the shots, Wallace said, " 'I better stop to see what it was.' I told him, 'Ain't going to stop to see what was happening there.' " Defendant's explanation as to his presence at the scene of the crime is most improbable and undoubtedly was so considered by the jury. In People v. Pelkola, 19 Ill2d 156, 166 NE2d 54 (1960), it is stated (p 162):

"Where the record contains sufficient competent evidence to establish the guilt of a defendant beyond reasonable doubt, the judgment will not be reversed for error in admitting evidence unless it can be seen that the error was prejudicial."

We think that pronouncement applies here. This record contains sufficient competent evidence to establish the guilt of defendant Kelly beyond reasonable doubt, and the alleged errors by the trial court do not justify a reversal of the judgment of conviction.

For the reasons given, the judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.