THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TRUXTON K. FIELD, Defendant-Appellant.

(No. 71-270; ■■■■■■■■

Fifth District—July 25, 1973.

Robert E. Farrell, District Defender, of Mt. Vernon, (Kenneth L. Jones, Assistant District Defender, Kathleen Buck and Nicholas J. Schiralli, Senior Law Students, of counsel,) for appellant.

Robert H. Rice, State's Attorney, of Belleville, James W. Jerz and Martin Moltz, of Model District State's Attorneys Office, of Elgin, for the People.

Mr. JUSTICE CREBS delivered the opinion of the court:

Defendant, Truxton K. Field, was tried by jury in the Circuit Court of St. Clair County on an indictment charging him with the crime of murder. He was found guilty and sentenced to the penitentiary for a term of not less than 45 nor more than 90 years. On appeal defendant argues that he was not proven guilty beyond a reasonable doubt, that the court erred in admitting into evidence defendant's oral confession and that the court further erred in admitting into evidence certain photographs of the murder victim taken during an autopsy procedure. Defendant also assigns as error the admission of certain other evidence, notably hearsay evidence concerning telephone conversations, and also the victim's bloody clothing. Defendant's final argument is that the sentence imposed was excessive.

The facts in this case as they were presented to the jury are substantially as follows: On March 9, 1970, the decedent's body was found on the edge of a woods in St. Clair County. An autopsy was performed on the body and the coroner testified that the cause of death was gunshot wounds to the head. There were two wounds in decedent's head, either of which would have been fatal. Pictures were entered into evidence over defense's objection which showed the position of these wounds by the insertion of surgical instruments in the bullet holes. The chief prosecution witness was Johnny Vunetich, a cousin of the defendant. It was his testimony that he and the defendant returned a borrowed car to the apartment of Ben Goodon whereat Vunetich called the decedent in order to get a ride home. While waiting for the decedent to arrive, Vunetich told defendant that decedent was a homosexual, and defendant thereupon evinced a desire to "roll" decedent, to which Vunetich agreed. When decedent arrived, Vunetich sat in the passenger seat and defendant in the back. They drove to a site known as Dutch Hollow Road whereat defendant shot decedent in the finger and then shot him in the head. Defendant and Vunetich then dragged decedent from the car and left him lying in the grass. Before leaving him defendant shot decedent in

the head a second time. The gun was buried and defendant and Vunetich ran to the BZB Restaurant from which Vunetich called his mother to pick them up. Defendant then called Goodon and told him that he had shot someone. Vunetich's mother picked up the pair. Vunetich was thereafter picked up by the police. He first stated that he knew nothing about the crime, but later gave a detailed statement. In that statement he indicated that defendant had previously stolen a .38 caliber gun from a house in the area and that other objects stolen from the house were sold through Goodon. It was Vunetich's testimony that he knew that defendant was a police informant and that decedent was a homosexual. He had previously spent the night with decedent, and decedent had given him money on occasions.

Mrs. Vunetich, the mother of Johnny Vunetich, also testified for the State. She stated that she received a call from defendant and that she drove to the BZB to pick up her son and defendant. She dropped her son off to see his girl friend and brought defendant home with her, at which point defendant told her that he had shot a man three times and that he, too, had been shot. Defendant then burned his bloodstained clothes on her patio. She further testified that she had seen defendant with a .38 caliber gun on the day preceding the crime in question.

Another state witness testified that approximately three weeks prior to his arrest, defendant asked the witness to purchase some .38 caliber shells for him and there was testimony from several other witnesses that they had seen defendant with a .38 caliber revolver shortly prior to the crime in question.

The first witness for the defense was Ruth Brown, who testified that Johnny Vunetich came to her apartment on the day in question and confessed that he had killed a man and that he had thrown the gun used in the crime over a cliff. A week after the crime, Vunetich told this same witness that it was defendant and not he who had shot decedent. A St. Clair County deputy sheriff testified that he transported Johnny Vunetich from the county squadroom to the detention home and that enroute, Vunetich admitted that he had killed decedent. A security guard at the detention home also testified that Vunetich told him that he had killed a man with a .38 and that he bragged about killing the decedent to other juveniles being detained, never mentioning defendant. There were several other witnesses who testified to the fact that Vunetich admitted and bragged about killing the decedent and digging up the buried gun and throwing it in a river. Defendant then testified in his own behalf. It was his testimony, which was corroborated by police witnesses, that he was a police informant and that he had been sent to meet Goodon and obtain information about a "fencing" operation which Goodon was sus-

pected of conducting. He testified that he had a .38 caliber Smith and Wesson firearm which Johnny Vunetich had stolen in a burglary and given to Goodon who, in turn, gave it to defendant. On the evening prior to the occurrence in question, he picked up Johnny Vunetich and together with several other people they proceeded to make the rounds of a number of bars. At approximately 4:30 A.M. they arrived at Goodon's apartment. The next afternoon Vunetich told defendant that he was leaving Goodon's house with a homosexual friend. Defendant did not go with Vunetich because he was suffering with a hang-over. Vunetich later called defendant at Goodon's apartment from the BZB and told him that he had shot his homosexual companion. Goodon was called in rebuttal by the State and he denied ever having given defendant a gun or being involved in a "fencing" operation, and reiterated his previous statement that the defendant had told him he had shot and killed a man.

■■ The first issue raised on appeal is whether or not the State proved defendant guilty beyond a reasonable doubt. Defendant points out that the prosecution's case rested primarily upon the testimony of the accomplice, Johnny Vunetich, whose testimony is conflicting. It is well established that it is within the province of the jury to weigh the evidence and determine the facts and we will not interfere with that province unless the verdict is found to be palpably contrary to the weight of the evidence. (*People v. Pulaski*, 15 Ill.2d 291, 155 N.E.2d 29.) While it is true that the testimony of an accomplice witness is subject to grave suspicion and should be acted upon with great caution (*People v. Tillman*, 130 Ill.App.2d 473, 265 N.E.2d 904; *People v. Kelly*, 73 Ill.App.2d 142, 219 N.E.2d 744), a jury may, nonetheless convict even on the uncorroborated testimony of a defendant's accomplice if said testimony is credible. (*People v. Reyes*, 131 Ill.App.2d 134, 266 N.E.2d 539.) In this case we not only have the testimony of an accomplice, Johnny Vunetich, but we also have the testimony of other individuals corroborating his statement. Ben Goodon testified that a phone call was made from his house to that of the decedent on the day in question and that he received a phone call from defendant sometime later on the same day at which time defendant admitted killing the decedent. The coroner's examination revealed that the bullets traveled in directions compatible with the witness Vunetich's description of the crime. Defendant admitted owning a .38 caliber gun and several people testified to seeing him in possession of such a gun just prior to the murder. The fact that the witness, Vunetich, bragged to several people that he had killed the decedent and that his testimony was conflicting in certain respects goes to the weight and credibility of his identification of defendant as the perpetrator of the crime, but does not destroy his competency. It was in the jury's province

to assess the credibility of the witnesses and we find that there was insufficient evidence, if believed, to establish defendant's guilt beyond a reasonable doubt.

■■■ The next issue raised is whether the trial court committed reversible error in admitting into evidence testimony concerning defendant's alleged oral confession. In regard to this confession, it is first claimed that it was inadmissible by virtue of the failure of the State to give defendant proper notice thereof and a list of witnesses thereto. Two State witnesses were allowed to testify that defendant told them approximately three weeks prior to trial that if there was some assurance that other individuals involved in the commission of the crime were also punished, he would show them where the gun used in the commission of the crime was hidden. Prior to the time this statement was allegedly made, the State provided the defendant with a Bill of Particulars in which it was stated that there was no confession. Four days prior to trial the State filed an amended list of witnesses wherein the witnesses to the alleged oral confession were set forth. No notice of the alleged confession was given. Section 114—10(a) of chapter 38 of the Illinois Revised Statutes requires the State to furnish defendant, upon motion, a copy of any written confession or a list of witnesses to any oral confession and further provides that no such confession shall be received in evidence which is not furnished in compliance with those requirements. As noted in defendant's brief, the purpose behind this enactment was to provide the accused with protection against surprise, unfairness and inadequate preparation by requiring disclosure prior to trial of the specified information as to confessions and witnesses thereto. (*People v. O'Connell*, 30 Ill.2d 603, 198 N.E.2d 834.) In the case now before us, we feel that there is no showing that defendant was prejudiced or that he was not protected against surprise, unfairness and inadequate preparation. Prior to trial, defense counsel was given an opportunity to interview the two witnesses who testified as to the confession and did in fact interview them and admitted that he knew of the purported statement prior to trial. Furthermore, there was no objection at the time of trial that the provisions of section 114—10(a) had not been complied with and in fact defense counsel specifically stipulated that the trial could proceed, subject to his right to confer with the witnesses prior to their testimony. It is thus clear that any violation of section 114—10(a) was waived.

■■ Aside from the argument concerning notice of witnesses and confession, defendant also contends that the confession was inadmissible, in that it was involuntarily made because of an inducement through a promise of more lenient sentence. This argument arises out of the context

of the statement itself. Sheriff O'Neal testified that defendant requested to see him and that when he arrived he asked defendant what he wanted, whereupon defendant, in O'Neal's words, stated, "He said it looked as though, he said, he had been asked to take a plea of 14 to 20 and if he was going to have to go he wanted two other people to go with him. If I could guarantee that they would go, too, he said, I'll even show you where the gun is I used on Diehl." Defendant claims that this statement shows that the confession was made as a result of a promise of 14-20 years. This argument is without merit. That statement merely indicates that defendant felt that he was going to have to go to prison and that if he went he also wanted some other individuals allegedly involved in the crime to go also. The statement was made as an inducement to the police to prosecute alleged co-perpetrators of the crime, and there is no showing that it was made as the result of a promise of leniency to defendant.

■■ Defendant further claims, in regard to the confession, that it should have been suppressed by virtue of the fact that he was denied his Sixth Amendment Right to Counsel. In support of this argument, he cites the landmark decision of *Massiah v. the United States,* 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199, in which case the Supreme Court reversed a conviction where, after indictment, defendant made a voluntary statement outside the presence of his counsel. In that case, however, the statement was made to a confederate of defendant and was overheard by government agents through a radio hidden in the confederate's automobile, with the confederate's consent. We do not think that the facts in the instant case fall within the *Massiah* rule, and do not feel that *Massiah* was intended to be an absolute mandate, barring all statements made outside the presence of counsel. (*United States v. Springer,* 460 F.2d 1344, 1350.) Here there was no interrogation or ruse which was used in order to induce defendant to make an inculpatory statement. The statement was, in our view, voluntary and admissible.

■■ The next assignment of error is the trial court's admission of certain photographs of the decedent taken during an autopsy procedure. It is his claim that these pictures were inflammatory, irrelevant and prejudicial. One of the photographs shows the body of decedent viewed from a position directly behind the top of decedent's head. Tweezers are protruding from a bullet hole in the right side of decedent's head and a long probe is placed in the bullet hole on the left side of the head. The top of decedent's head is covered by numerous scabs. The other photograph complained of depicts a close-up of decedent's bloodstained hand. The coroner testified that one of the bullets entered the right temple region of decedent just in front of his ear and traveled downward to the bottom

of the brain. The second bullet entered the left temple at a slight downward angle. He also testified that dirt was found in the scabs on top of decedent's head. It was the testimony of Johnny Vunetich that defendant shot decedent in the hand prior to shooting him in the head. It is defendant's position that these pictures do not help explain testimony of the doctor, or Vunetich, and were used only to inflame the passions and prejudices of the jury. It is well established in this State, however, that the admission into evidence of photographs of a murder victim is within the sound discretion of the trial court (*People v. Myers,* 35 Ill.2d 311, 220 N.E.2d 297; *People v. Nicholls,* 42 Ill.2d 91, 245 N.E.2d 771; *cert. denied.* 90 S.Ct. 578, 396 U.S. 1016, 24 L.Ed.2d 507), although if that discretion is palpably abused, reversal is warranted. (*People v. Lefler,* 38 Ill.2d 216, 230 N.E.2d 827.) In the case now before us, we do not feel there was such an abuse of discretion. The tweezers and probe which were inserted in the bullet wounds aided the jury in assessing the coroner's evidence by showing the position and angle of the bullet wounds and the picture of the hand corroborated Vunetich's testimony. Under the circumstances, we do not deem the admission of these pictures to constitute reversible error. *People v. Jackson,* 9 Ill.2d 484, 138 N.E.2d 528.

■■■ Defendant also cites several other alleged errors which he admits do not, standing alone, constitute sufficient cause to reverse the trial court decision. It is claimed, however, that the cumulative effect of these errors constitutes sufficient grounds for reversal. The first error assigned is the court's refusal to permit a witness to testify by virtue of her presence in the court room contrary to an order excluding witnesses. The well established rule is that the decision of whether or not a witness who has disobeyed an exclusionary order should be allowed to testify is within the sound discretion of the court. (*People v. Nelson,* 33 Ill.2d 48, 210 N.E.2d 212; *People v. Bridgeforth,* 51 Ill.2d 52, 281 N.E.2d 617; *People v. Hairston,* 46 Ill.2d 348, 263 N.E.2d 840.) We do not feel that there was an abuse of this discretion. Furthermore, there was no offer of proof in regard to what the witness would have testified to and the point is thus not preserved in the record.

■■ Defendant also objects to the testimony of a police officer in regard to a telephone conversation to determine the ownership of decedent's motor vehicle. It is clear that the testimony was hearsay and should have been excluded, but in view of the testimony of other witnesses who identified the car as that which belonged to decedent, we cannot find any prejudicial effect in the erroneous admission of this hearsay testimony, particularly when the facts testified to were not material to the charge against defendant.

■■ Objection is also made to the admission of testimony of a certain police officer as to whether certain telephone calls had been placed from the phone number of Ben Goodon to the residence of the decedent. The police officer testified from telephone records and there was admittedly an improper foundation for the admission of this evidence. Again, however, there was sufficient corroboration through the testimony of other witnesses to establish the fact that telephone conversations were made and we do not feel that the defendant was in any way prejudiced by the admission of this testimony.

■■ Defendant also complains that the testimony of the coroner in regard to the cause of death was repetitious and served to inflame the jury. The doctor merely established the cause of death and the fact that the decedent had apparently been dragged, as evidenced by the muddy scabs on his head. We do not feel that this testimony was intended to, or was of such a nature as to inflame the jury.

■■ Another assigned error is the admission into evidence of decedent's bloody clothing. This clothing was admitted for the purpose of establishing that decedent had been dragged by the seat of his pants from the scene of the shooting and to that end, was corroborative of the testimony of the State's key witness, Vunetich, and was admissible on that basis.

■■ Defendant's final claim is that the sentence imposed, 45 to 90 years, was excessive, particularly in view of the fact that an admitted participant in the crime, Vunetich, was granted immunity from prosecution and still walks the streets. Defendant's past record reveals two prior felony convictions and he was not released from prison until March of 1970 and this crime occurred in March of 1971. We see little merit in defendant's claim that by virtue of defendant's long imprisonment he has been given no opportunity to show his rehabilitative potential. He has been in trouble since the age of 16, and when not in prison, has been engaged in criminal activity culminating in the methodical coldblooded murder for which he was here tried. We do feel, however, that the sentence does not meet the current guidelines in regard to the relation of minimum to maximum sentences, and, therefore, reduce the sentence imposed to a minimum of 30 years and a maximum of 90 years. The decision of the trial court is therefore affirmed as modified.

Affirmed.

G. MORAN, P. J., and JONES, J., concur.