THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BOBBY JOE JOHNSON, Defendant-Appellant.

Fifth District   No. 76-55

Opinion filed March 28, 1977.—Supplemental opinion filed upon denial of rehearing April 27, 1977.

James A. Bell and Allen I. Harris, both of St. Louis, Missouri, for appellant.

Clinton Thurston, State's Attorney, of Cairo (Bruce D. Irish and Keith P. Vanden Dooren, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

Defendant-appellant Bobby Joe Johnson was convicted of attempt murder and aggravated battery after a jury trial in the Circuit Court of Alexander County, and was sentenced to a term of four to six years in the penitentiary for attempt murder. On appeal he raises numerous issues, only one of which we find it necessary to address: whether the court below committed reversible error in excluding the testimony of a prospective defense witness who had been in the courtroom during the

testimony of other witnesses in violation of the sequestration rule announced by the court at the beginning of the trial.[1]

The instant charges stemmed from a gunshot wound in the forearm suffered by one Donald G. Cook during a barroom brawl at a tavern, variously denominated as Ruby's Grove and the Stork Club, located in Future City, just north of Cairo. Cook testified that on the night of January 26, 1975, he was on his way with three friends from the suburbs of Chicago to Kentucky Lake. About 11 p.m., they stopped at the Stork Club to purchase some beer. They paid the cover charge of 75 cents apiece, bought beers, and found places to sit. There were 25 to 30 people in the establishment; all but Cook and his three friends were black. The tavern was dimly lit. There were "black lights" on the stage, where a man was playing records.

According to Cook, one of his companions, James Lubin, walked over to a nearby table where four young black women were sitting and asked one of them to dance. The woman began to shout at Lubin, and someone else came up and hit him. Cook and his other two companions were moving towards the altercation when one of them, Thomas Palmer, was knocked to the floor with a short club. Two men then grabbed Cook and spun him around. Another man, whom Cook identified as the defendant, then approached within five or six feet of him with a small-caliber gun, which he fired into the floor in front of Cook. He then pointed the gun at Cook's head, said that he was going to kill him, and pulled the trigger. Cook threw up his hands and was struck by a bullet in the left forearm. He fell to one knee and watched his assailant run away. As he got up, someone else hit him in the mouth. When he and his friends were able to leave the tavern, they went to the Cairo hospital. Later that night Cook was transferred to another hospital in Paducah, Kentucky. The bullet shattered the bone in his left forearm, necessitating the placement of a three-inch steel plate in his arm.

Cook testified that he described his assailant to police as a slender black man about six feet tall, wearing a light sports coat and a dark shirt open at the neck. The man was not, according to Cook, wearing denim clothing. The day after the shooting, while he was still in the hospital, Cook was unable to identify his assailant from photographs. About six days later,

---

[1] Appellant's other contentions are: that the evidence was insufficient to support a verdict of guilty beyond a reasonable doubt; that the court erred in not permitting the attorneys to participate in voir dire; that the court erred in refusing defendant's request for a mistrial after a prejudicial comment by a venireman; that the court erred in permitting the victim, a non-expert, to testify as to medical treatment of his injuries; that the court erred in admitting into evidence two spent .22-caliber shells; that the court erred in refusing defendant's proffered instruction as to the lesser included offense of simple battery; that the return of verdicts of guilty of both aggravated battery and attempt murder constituted double jeopardy; and that defendant's sentence was excessive in light of the facts of the case and his potential for rehabilitation.

however, he selected a photograph, which he testified was that of the defendant, from several pictures brought to him by the police. None of the officers to whom Cook gave his description, or in whose presence he made the photographic identification, was called to testify, nor were the photographs or any record of the photographic identification introduced into evidence.

The State's second witness was Thomas Palmer, whose account of the incident was substantially the same as Cook's. He testified that as he approached Lubin he was clubbed across the forehead and knocked to the floor. When he got up he heard a shot. He looked in the direction of the shot and saw a man, whom he identified as the defendant, fire a second time. He said that he saw the defendant later that night at the hospital in Cairo, and told one of the police officers that he had seen the gunman. He testified that he selected the defendant's picture from some 15 shown to him by police the day after the shooting.

Palmer denied offering any of the young women at the next table money to have sexual intercourse with him. He said that he asked one of the girls if she wanted to dance and she began swearing at him. He testified that he had originally told the State's attorney's investigator that Cook's assailant was black, under 30, five feet eight inches tall with a medium build. In court, however, when Palmer, who was six feet one inch tall, stood next to the defendant, they were about the same size. His in-court description of the clothing worn by the man who shot Cook was similar to Cook's. The light sports coat, he said, had a kind of houndstooth check. Shortly after the incident, however, Palmer had told the investigator that the assailant was wearing a green shirt and pants.

Connell Smith, Jr., a State police detective, and James Hunt, Jr., an Alexander County deputy sheriff, then testified as to the chain of custody of two spent .25 caliber casings and one slug recovered by Hunt at the Stork Club. The casings and slug were admitted into evidence over objection of the defendant.

Hunt testified that he arrived at the tavern about 11:30 the night of January 26, about half an hour after the shooting. When he arrived, the door to the establishment was not locked, and a number of people were still there. Although he knew there had been a shooting, he did not search for a gun or conduct an investigation right away; instead, he waited until the place cleared out. Other officers arrived on the scene five or ten minutes later. When Hunt did execute a search, he found no guns. The defendant was among the patrons still there when Hunt arrived. The officer "used reasonable force," as he put it, to get the defendant out of the way during his investigation. He did not know how the defendant was dressed. No scientific tests were conducted to determine whether the defendant or anyone else had recently fired a gun.

J. Reid Abercrombie, the Alexander County clerk, testified that Ruby's Grove, the former Stork Club, had been licensed to sell liquor on January 26, 1975. The State moved, without objection by defendant, that the court take judicial notice of section 12b of the Liquor Control Act (Ill. Rev. Stat. 1975, ch. 43, par. 133), which provides that no person shall be denied the full and equal enjoyment of the accommodations of any place licensed to sell liquor. After the court read this statute to the jury, the State rested its case.

The first four witnesses for the defense were Floretta Avant, Barbara Holder, Mary Holder, and Ida Duncan, who had been sitting at the table in the tavern near the four white men before the shooting. Floretta Avant testified that shortly after the men entered, one of them came over and offered to buy her a drink. When she declined, he offered her money "[f]or my body" and put his hands on her. She cursed him and he eventually returned to his seat. Later, another of the men came over to the young women's table and "said and did the same thing. Only he didn't leave." Mary Holder hit him over the head with her purse, but he still wouldn't leave. A preacher named Bill Land came over and told the man to leave the women alone, but "[t]he guy got smart with him." Then James "Switch" Wilson came over to the table, the man shoved him and swung at him, and a fight broke out.

Barbara Holder's account was similar. Both men who approached their table, she testified, "kept on rubbing on me and feeling on me" after she told them to leave and "asked me did I want to make some money." The second one "wouldn't take no for an answer," even after she threatened to hit him with a beer bottle. When Wilson came over to the table, the white man swung at Land but hit Wilson instead, setting off the fight. She had seen the defendant earlier in the evening, standing at the bar. He was wearing a blue jean outfit. She said that the tavern was dark, lighted by a black light and a "psychedelic light" that flashed rapidly on and off.

Mary Holder gave a similar account. She too had seen the defendant at the bar, wearing a blue jean outfit.

Ida Duncan testified that she saw the second white man offering a $20 bill to Barbara Holder. She also had seen the defendant standing at the bar, but didn't notice how he was dressed. Asked about the lighting in the tavern that night, she said that there were "flashing lights." All four of the young women ran to the restroom after the fighting broke out; none of them saw the shooting.

The one defense witness who did claim to have seen the man who fired a gun was the Reverend William L. Land. He identified himself as pastor and administrator of social programs of the First Community Baptist Church in Atlanta, Georgia; he was also a special deputy sheriff in Fulton County, Georgia. On January 26, 1975, he had been in Cairo to officiate

and deliver the eulogy at the funeral of the grandfather of the Reverend Charles Koen. Later that evening, he had followed the defendant and some other people out to Ruby's Grove to listen to some music. He went in the Reverend Koen's car, arriving about 10 or 10:30 p.m. He had noticed that the women were becoming upset, and could see an explosive situation developing, so he tried to talk the man into leaving the women alone. When the man lunged at him, Land executed a defensive karate movement and the man hit Wilson instead. Then "[t]he place blew."

Land testified that he saw a medium light-skinned man with a small build, whom he did not know, fire into the air. Later, he saw the owner of the tavern and the owner's father with a .38 revolver and a shotgun, respectively. When Land heard the owner tell the deputy sheriff that Wilson had been in the fight and had had a gun, Land informed Hunt that Wilson had not been the one with the gun, that it was "a guy of smaller build, light skin guy who shot." Land testified that the man who fired the shot was about five feet seven or five feet eight inches tall, and weighed 150 to 155 pounds. Later, Land observed an altercation between Deputy Sheriff Hunt and the defendant in which Hunt hit the defendant in the face with the butt of his shotgun. Land had met the defendant on one previous occasion. He said that the defendant was wearing a dungaree suit on the night of the shooting. Land estimated that the visibility in the place was only above five or six feet because of the black light and the strobe light.

The next defense witness was Marvin Smith, the disc jockey at the tavern on the night in question. He testified that in addition to playing records, he was in charge of operating psychedelic lights and strobe lights, which he described: "[A] psychedelic light is a light of different colors, a variety of colors and they are operated by the speaker system, by the sound through the speakers. A strobe light is a bright white light and it operates on the flashing system. It throws a light beam seconds apart." He said that at the time of the fight, the place was very dark except for his lights. Over objection, Smith was permitted to demonstrate his strobe light to the jury

Kevin Crawford next testified that he was sitting at the bar in the tavern the night of January 26 and heard two shots ring out. At that time, he testified, the defendant was also sitting at the bar. The defendant was wearing a blue jean top and blue jeans.

Finally the defendant, Bobby Joe Johnson, took the stand in his own behalf. He testified that he had attended a funeral on the afternoon of January 26, had then gone to the home of the nephew of the deceased, and arrived at the Stork Club about 10:30 p.m. He was standing at the end of the bar when the fight broke out; he couldn't see what was happening because of the partition separating the bar from the dance area. He

testified that he neither had nor fired a gun, and had never seen Donald Cook prior to the trial. Johnson said that he had gone to the hospital later the night of the shooting. He was wearing a blue jean demin suit.

At this point in the proceedings, the following colloquy took place out of hearing of the jury:

"MR. HARRIS [defense counsel]: Your honor, I would be prepared to rest. However, I have just found out that I have another witness who has violated the rule on witnesses. He's Pat Flynn from Land of Lincoln Legal Aid. He said [he saw the defendant] the next day direct from the hospital and at that time the man had on a blue jean outfit. I would like to put him on.

THE COURT: You say it's someone that's been in the room?

MR. HARRIS: Yes, it's a young lawyer for the Land of Lincoln. He's been observing as a professional observer.

THE COURT: You said when he saw him, that was the next day?

MR. HARRIS: Right, after he left the hospital. He got emergency treatment.

MR. SPOMER [State's Attorney]: It violates the rule on witnesses. Secondly, it's not the description of the man. He didn't see him at the establishment.

THE COURT: I see no way we can get him in. It is in the ruling, Mr. Harris * * *."

In rebuttal, the State called Thomas Burris, Jr., who testified that he had been in the tavern that night and had seen the defendant in the area where the shots were fired. Burris heard only one shot; he did not see who fired it. A former Cairo police officer, he was carrying a .357 magnum pistol at the time of the incident in question, but did not draw or fire it. He saw the tavern owner with a .38-caliber pistol, but said that the shot he heard was not loud enough to have come from a .38.

After closing arguments and instructions to the jury, the jury retired. Less than 1½ hours later, it returned with guilty verdicts on both charges.

Defendant filed a motion for a new trial, raising the same issues as those raised on this appeal. At the hearing on the motion, which alleged, *inter alia*, that Flynn's violation of the rule was not through collusion, and that the fact that Flynn had any knowledge relevant to the case did not come to his attention until late in the trial, defense counsel said:

"The testimony of Mr. Flynn would have stated that he saw the defendant a few hours thereafter when he came in to talk with him about the altercation he had with the Deputy Sheriff. At the time he saw him he was wearing the blue jean outfit in question. Also this blue jean outfit was covered with blood so that it would indicate that he was in fact wearing it at the time of the altercation.

Therefore it goes to the question of the identification. If this was the man in the blue jean jacket, then the man in the beige colored jacket who fired the shot would have been someone else."

Later, counsel continued:

"I hate to go into this other ground. However, I would state that Pat Flynn is a Caucasian by race, and if he did testify, we would have a Caucasian verify what various Negroes have already said. And the very fact of his race might have had some influence on that jury."

This appeal followed denial of the post-trial motion.

■■ Exclusion of witnesses from the courtroom during trial is a time-honored practice designed to preclude one witness from shaping his testimony to conform to that of those who preceded him on the stand. As the court pointed out in *People v. Jenkins,* 10 Ill. App. 3d 588, 590, 295 N.E.2d 123, 125 (1st Dist. 1973):

"Ever since Daniel confounded the Elders by examining one out of the presence of the other and proving that they had given false testimony against Susanna, it has been thought prudent to exclude witnesses from the presence of each other before they testify. This prudence has evolved the rule that a trial court has the power to exclude witnesses during the trial of a case and to direct that they shall be examined out of the hearing of each other."

Nevertheless, it is well settled in this State that a trial court is vested with discretion to permit a witness to testify even if he has violated an order excluding witnesses. (*People v. Farnsley,* 53 Ill. 2d 537, 293 N.E.2d 600 (1973); *People v. Crump,* 5 Ill. 2d 251, 125 N.E.2d 615 (1955); *Bow v. People,* 160 Ill. 438 (1896); *Kota v. People,* 136 Ill. 655 (1891); *cf.* Annot., 14 A.L.R.2d 16, 22 (1967): "All of the American cases agree that a violation of the exclusion order does not result in an automatic disqualification of the witness * * *.") The rule in Illinois has long been that for a reviewing court to reverse a judgment because of the trial court's refusal to allow a witness to testify, it must be shown that the party offering the witness was deprived of material testimony without his fault. (*People v. Bridgeforth,* 51 Ill. 2d 52, 281 N.E.2d 617 (1972); *People v. Hairston,* 46 Ill. 2d 348, 263 N.E.2d 840 (1970); *People v. Viskniskki,* 255 Ill. 384 (1912).) The rationale behind the rule is that an innocent litigant should not be punished by deprivation of testimony material to his case because a witness, without his knowledge or fault, violates the rule of the court. *People v. Viskniskki; Ewing v. Cox,* 158 Ill. App. 25 (2d Dist. 1910). See also Annot., 14 A.L.R.3d 16, 23 (1967).

The most thorough discussion of this problem in an Illinois case is found in *Palmer v. People,* 112 Ill. App. 527 (2d Dist. 1904). There, after a review of earlier cases, the appellate court concluded that the trial court

does not have absolute discretion to reject a witness merely because he has violated such a rule, but "a reasonable discretion, in view of all the facts and circumstances—a discretion which can be abused and the exercise of which may be reviewed * * *." (112 Ill. App. 527, 533.) After quoting authorities including *Holder v. United States*, 150 U.S. 91, 37 L. Ed. 1010, 14 S. Ct. 10 (1893), to the effect that a court should not deprive an innocent party of the material testimony of a witness who has disobeyed an exclusion order, the appellate court in *Palmer* continued:

> "Considerations of natural justice support the rule above stated. A party cannot select his witnesses. He must call those persons who happen to have observed some fact which tends to establish his case. He cannot control their conduct or make them discreet. He is obliged to use them whether wise or foolish. A party to a suit on trial, especially a defendant charged with felony, as was the case here, may not have time carefully to watch each witness to see that he obeys the orders of the court. * * * To deprive a party of his witness because of misconduct which the party has not caused, procured or permitted, would be to punish the innocent. It would furnish an unwilling or hostile witness with the means of avoiding the witness stand. The great object of a judicial trial of a question of fact is to ascertain the truth. The rule here contended for would exclude testimony which might be essential and even conclusive. To our minds it is not consonant with justice that a party shall thus be deprived of testimony. We therefore hold that it is not a reasonable exercise of discretion for a trial judge to deprive a party of a witness who has heard testimony in violation of an order excluding witnesses from the court room, unless such party or his attorney is in some way responsible for the violation of the order, or has connived at it or knowingly permitted it without objection, and that even in the latter case, a sound judicial discretion should lean to the admission of the testimony in all cases of doubt." 112 Ill. App. 527, 535.

Similar expressions occur in numerous cases arising out of other jurisdictions. Perhaps the most eloquent was made 90 years ago by Mr. Justice Bryan, writing for the Supreme Court of Maryland in the case of *Parker v. State*, 67 Md. 329, 331-32, 10 A. 219, 220-21 (1887):

> "[I]t is not reasonable to take away from a prisoner on trial the benefit of testimony on which his life may depend, because of the misconduct of another person.
>
> "The humanity of the law is shocked at the punishment of the innocent. It provides with the greatest solicitude that persons accused of crimes shall have fair and impartial trials. The object is considered of sufficient importance to be guaranteed by the

solemn and impressive declarations of our organic law. The scheme and theory of our legal system seek to provide that no man shall be adjudged guilty, unless the truth of the matter charged upon him has been established after a fair and full investigation. The ascertainment of the truth is the great end and object of all the proceedings in a judicial trial. * * * Subject to * * * well-known and distinctly marked exceptions, a person on trial has the right to prove the truth relating to the accusation against him by the evidence of all witnesses who have any knowledge of it. And they are compelled to attend and deliver their testimony in his behalf. Since such great care has been taken to secure the right of an accused person to prove the truth relating to the accusation against him, it would be very strange, if he should forfeit this most precious privilege by the misbehavior of a witness. * * * If the evidence of such witness would show the innocence of a prisoner on trial for his life, then the discretion of the Judge to admit or reject the testimony amounts to a discretion to take the prisoner's life, or to spare it. The wise, just and merciful provisions of our criminal law do not place human life on such an uncertain tenure. A man's life and liberty are protected by fixed rules prescribed by the law of the land, and are not enjoyed at the discretionary forbearance of any tribunal. All suggestions of this kind are alien to the spirit and genius of our jurisprudence."

See also, e.g., State v. Cox, 42 Ohio St. 2d 200, 327 N.E.2d 639 (1975); Robinson v. Tennessee, 340 F. Supp. 82 (E.D. Tenn. 1972); People v. Duane, 21 Cal. 2d 71, 130 P.2d 123 (1942); Degg v. State, 150 Ala. 3, 43 So. 484 (1907); Johnson v. Cooley, 30 Tex. Civ. App. 576, 71 S.W. 34 (1902); State v. Lee Doon, 7 Wash. 308, 34 P. 1103 (1893); Davis v. Byrd, 94 Ind. 525 (1884); Rooks v. State, 65 Ga. 330 (1880).

As the recital of the facts of the instant case makes clear, the crucial issue at trial was whether or not Bobby Joe Johnson was actually the man who shot Cook. His conviction rests solely on the in-court identifications of Cook and Palmer, whose opportunity for viewing Cook's assailant in the poorly lit tavern during the brawl could not have been very good. There was no physical evidence connecting defendant with the offense, other than the undisputed fact that he was present in the tavern on the night of the shooting. No tests were conducted to determine whether he had fired a gun. No weapon was found. Defendant's testimony that he was at the bar at the time of the shooting, rather than on the dance floor where the shooting took place, was corroborated. Other than Cook and Palmer, only one witness even saw the defendant away from the bar at any time during the night, and that witness did not claim to have seen the shooting. Five defense witnesses, including the defendant, testified that

he was wearing a blue jean, blue denim, or dungaree outfit, in contrast to the testimony of Cook and Palmer that Cook's assailant wore a light-colored sports coat (and Palmer's statement to the investigator that the man was wearing a green shirt and pants). Palmer's original description of the gunman as five feet eight inches tall, with a medium build, matched that of the gunman described by the Reverend Land, but not that of the defendant. Deputy Sheriff Hunt, who became involved in an altercation with the defendant on his arrival at the scene, did not know what he was wearing.

■■ We think it is indisputable that the testimony of Flynn as to the clothes worn by the defendant early the next morning would have had probative value. There has been no suggestion that defendant or his attorney was in any way responsible for Flynn's violation of the rule on witnesses announced by the court. We hold, therefore, that defendant was deprived of material testimony without his fault by the court's refusal to permit Flynn to testify, and that the conviction must be reversed and the case remanded for a new trial.

The State contends that Flynn's testimony would have been merely cumulative, in light of the testimony of the other defense witnesses, and that the error, if any, in excluding him as a witness was not prejudicial. We cannot agree. The testimony of Attorney Flynn, as a presumably disinterested officer of the court, might very well have been more credible to the jury than that of the other witnesses called by the defense, all of whom were acquaintances of the defendant.[2]

■■ The instant case, we think, stands in quite a different posture from the case of *People v. Bridgeforth*, 51 Ill. 2d 52, 281 N.E.2d 617 (1972), cited by the State. In that case, the majority of the court merely held that, in the absence of an offer of proof, and given the fact that what the excluded witness would apparently have testified to had already been conveyed to the jury by other means, the exclusion was not so prejudicial as to require reversal. It is true that an offer of proof as to what the excluded witness' testimony would have been is ordinarily required to preserve the issue for review. (See, *e.g., People v. Field*, 13 Ill. App. 3d 74, 299 N.E.2d 754 (5th Dist. 1973).) Although defense counsel here did not make a formal offer of proof by calling Flynn to the stand and making a record of his proposed testimony out of the presence of the jury, he did make clear to the court what Flynn's testimony would be if he were

---

[2] Nor can we ignore the fact that Flynn, unlike the defendant and all the other defense witnesses, was white. Racial overtones were inherent in the case. In addition, during voir dire a prospective juror responded to a question from the court that the defendant "was one of those that gave us a little trouble a few years ago." Apparently the venireman, Fred Khourie, proprietor of a department store in Cairo, was referring to a boycott of white merchants organized by the United Front, an organization headed by the Reverend Charles Koen in which the defendant had been active.

allowed to testify. The trial court indicated at the hearing on the post-trial motion that it was quite aware of what Flynn's testimony would have been. A formal offer of proof may have been preferable, but under the circumstances we think that defense counsel's statement to the court was sufficient to serve the purposes of an offer of proof: to give the trial court an opportunity to ascertain the admissibility of the offered evidence and to enable the reviewing court to determine whether there was prejudicial error in excluding the evidence. (*People v. Moore*, 27 Ill. App. 3d 337, 326 N.E.2d 420 (1st Dist. 1975); *cf. People v. Brown*, 27 Ill. App. 3d 569, 327 N.E.2d 51 (2d Dist. 1975).) A formal offer of proof is unnecessary where the purpose and materiality of the evidence sought are clear (*People v. Bibbs*, 115 Ill. App. 2d 200, 253 N.E.2d 179 (1st Dist. 1969), *cert. denied*, 398 U.S. 967, 26 L. Ed. 2d 552, 90 S. Ct. 2184 (1970); *cf. United States v. Schaefer*, 299 F.2d 625 (7th Cir. 1962), *cert. denied*, 370 U.S. 917, 8 L. Ed. 2d 497, 82 S. Ct. 1553 (1962), and *Braswell v. Wainright*, 463 F. 2d 1148 (5th Cir. 1972)), or where it is evident from the attitude of the trial court that such an offer will be of no avail. *City of Joliet v. Jackson*, 4 Ill. App. 3d 826, 281 N.E.2d 442 (3d Dist. 1972); *cf. People v. Duane*, 21 Cal. 2d 71, 130 P.2d 123 (1942).

Here, after the State objected to Flynn's taking the stand because of his violation of the rule on witnesses, the court said, "I see no way we can get him in." As in *Taylor v. United States*, 388 F.2d 786 (9th Cir. 1967), in light of this remark "[i]t is difficult to be certain whether the trial judge did in fact exercise discretion or whether he felt himself bound, once the rule of exclusion had been violated, to prevent the witness from testifying." (388 F.2d 786, 789 n. 1.) As the discussion of the law above makes clear, violation of an exclusion order does not result in automatic disqualification; the trial court must exercise a reasonable discretion in light of all the facts and circumstances surrounding the witness' violation of the rule.

The situation here is similar to that considered by the California Supreme Court in *People v. Duane*, where one Mrs. Leep, who had been defendant's counsel in civil matters, had sat with defense counsel throughout the trial. When the defense tried to call her as an alibi witness (she had been with the defendant during the time when certain of the crimes with which he was charged were allegedly committed), she was not permitted to testify. On appeal, the court said:

"* * * The situation was * * * one in which a defendant's witness in a criminal action was not permitted to testify on his behalf or even take the stand, because she had violated the court's order excluding witnesses. In connection with that violation there is no suggestion of collusion between defendant and the witness, nor does it appear that he had any control over her conduct. From

all that appears the witness was acting in entire good faith, believing that she was not included in the order of exclusion because she was assisting as counsel in the defense of defendant.

"There can be no doubt that the court committed error in refusing to permit Mrs. Leep to testify. The violation by a witness of an order excluding witnesses from the courtroom does not make such witness incompetent nor furnish grounds for a refusal to permit him to testify. The proper recourse is contempt proceedings against the witness. [Citations.]

"It is obvious that testimony by Mrs. Leep concerning appellant's claimed alibi * * * was of vital importance to appellant and the exclusion thereof would necessarily be prejudicial unless it may be said that appellant cannot show prejudice because he made no offer of proof showing the character of Mrs. Leep's proposed testimony. It is true that no such offer was made but it was unnecessary under the circumstances here presented. * * * [T]he court had absolutely refused to permit her to testify upon any subject under any circumstances, and that refusal had no relation to and was not based upon the nature, admissibility, or relevancy of any testimony she might give. Rather, it was a declaration that she was wholly incompetent to testify in the case. Where the trial court erroneously refuses to permit a witness to take the stand or be sworn to testify under any circumstances or upon any subject without regard to the question of the admissibility or relevancy of the evidence the witness might give, basing its refusal on the ground that the witness is wholly incompetent to testify, and it can be ascertained from the record that the witness' testimony would be vital, no offer of proof is necessary to establish that such error was prejudicial." 21 Cal. 2d 71, 80-82, 130 P.2d 123, 128-29.

*State v. Cox,* 42 Ohio St. 200, 327 N.E.2d 639 (1975), is also in point here. There too the proffered testimony went to the question of what clothing a certain person was wearing at the time of the crime: defendant, on trial for murder, claimed that the daughter of the victim was in fact the murderer.

"Her testimony was that she had not changed her blouse at any time after the murder. However, Tom Feltner's testimony [Feltner was the excluded witness] would have been to the effect that she had a different blouse on when she left for the drive to the school than the one she was wearing when she was questioned by police after the homicide. Thus, his testimony bore directly upon the defense's position that she had changed her clothes subsequent to

the incident and had lied in her testimony on this point. The excluded testimony also offered a plausible explanation of why her clothes were not blood-spattered if, as maintained by the defense, she had committed the brutal killing." (42 Ohio St. 200, 201-02 n. 1, 327 N.E.2d 639, 641 n. 1.)

Because Feltner's presence in the courtroom was not due to the fault of defendant or his counsel, the Ohio Supreme Court held that exclusion of this crucial testimony constituted prejudicial error.

Although we need not, and therefore do not, decide this case on constitutional grounds, we note that there is a serious question as to the constitutionality of the trial court's action here. The right of an accused to summon witnesses in his defense is fundamental to our legal system. Ill. Const. 1970, art. I, § 8; U.S. Const. amend. 6; *Washington v. Texas*, 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920 (1967); *People v. Watson*, 36 Ill. 2d 228, 221 N.E.2d 645 (1966); *People v. Cokes*, 106 Ill. App. 2d 139, 245 N.E.2d 507 (1st Dist. 1969).

In *Washington*, the United States Supreme Court held that the right of an accused to have compulsory process for obtaining witnesses in his favor, guaranteed in Federal trials by the Sixth Amendment, is so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment, and thus applicable to the States. Writing for the Court, Mr. Chief Justice Warren said:

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920, 1923.)

In reversing the judgment of conviction, the Court concluded that Washington

"* * * was denied his right to have compulsory process for obtaining witnesses in his favor because the State [by a statute which precluded co-defendants from testifying on behalf of one another] arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense. The Framers of the Constitution did not intend to commit the futile act

of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." 388 U.S. 14, 23, 18 L. Ed. 2d 1025, 87 S. Ct. 1920, 1925.

*Washington* was relied on by the Fifth Circuit Court of Appeals in *Braswell v. Wainwright,* 463 F.2d 1148 (5th Cir. 1972), which held that a State procedural rule requiring the exclusion of a witness who has remained in the courtroom in violation of a sequestration order must yield to a defendant's fundamental constitutional right to call witnesses in his behalf. The court acknowledged that:

> "Where the defendant has been advised of his constitutional right and there had been a knowing intelligent waiver by the defendant, exclusion would be permissible. And perhaps the consent, procurement, or knowledge on the part of defendant or his counsel might rise to the level of a waiver and thus render exclusion proper." (463 F.2d 1148, 1155.)

However, the court rejected the contention, similar to that made by the State in this case, that defense counsel's invocation of the rule on witnesses rose to the level of a knowing intelligent waiver. The court continued:

> "Closely related to Braswell's sixth amendment right is his right to a fair trial—to due process. Braswell had a right to at least present the testimony of his sole corroborating witness to the jury. That the jury might still have returned a guilty verdict is beside the point; judgment of the credibility of witnesses is for the trier of fact. The trial court arbitrarily excluded Rogers upon no other basis than that he violated the rule. Such discretion cannot be permitted when it denies a defendant a fundamental constitutional right." (463 F.2d 1148, 1155-56.)

We think that such a result is required by both the Federal and the Illinois constitutions.

For the foregoing reasons, the judgment is reversed and the cause is remanded to the Circuit Court of Alexander County for a new trial.

Reversed and remanded.

CARTER, P. J., and G. MORAN, J., concur.

SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING

Mr. JUSTICE KARNS delivered the opinion of the court:

The State has timely filed a petition for rehearing, urging that we decide the other issues raised by defendant which are certain to arise again upon a new trial. (See footnote 1 of our original opinion, 47 Ill.

App. 3d 362, 364, 362 N.E.2d 701, 702.) Our holding that defendant's conviction must be reversed and remanded for a new trial because of the court's exclusion of the material testimony of a prospective witness is not questioned. Specifically, the State requests that we decide whether the trial court erred in not permitting the attorneys to participate in *voir dire*; in permitting the victim, a nonexpert, to testify as to medical treatment of his injuries; in admitting into evidence two spent .25-caliber shells; and in refusing defendant's proferred instruction as to the lesser included offense of simple battery. In the interest of judicial economy, we have decided to address these issues.

The record reflects that, throughout *voir dire*, the court asked all the questions, periodically holding off-the-record conferences at the side bar with the attorneys. The court's questioning was thorough, and there is no indication of record that the court refused to ask any questions tendered by defense counsel, nor, in fact, that defense counsel ever sought leave to question prospective jurors directly. Before jury selection began, the following exchange took place between the court and defense counsel:

"THE COURT: * * * You are acquainted with the method that this Court uses in its Voir Dire examination of the selection of the jury. Are there any questions about that procedure?

MR. HARRIS: None, Your Honor.
* * *

THE COURT: Is there anything else you would like to have placed of record?
* * *

MR. HARRIS: No."

■■ In view of the defendant's failure to object to the method used by the court below in conducting the *voir dire*, and the absence of any indication of prejudice, we do not think that defendant can now be heard to complain on appeal that the procedure used contravened section 115—4(f) of the Code of Criminal Procedure (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(f)). Nor do we think that it is appropriate on this record for us to determine whether, as the State contends, the statute relied on by defendant is invalid as an undue legislative infringement on the inherent rule-making power of the judicial branch because it conflicts with Supreme Court Rule 234, made applicable to criminal trials by Rule 431. Ill. Rev. Stat. 1975, ch. 110A, pars. 234, 431.

■■ We have considered the other assignments of error and find them to be without merit. First, the court did not abuse its discretion in permitting witness Cook to testify that "I was shot in the left forearm, and the bullet went in this area and came out over here, which shattered the bone. I have a 3-inch steel plate in my arm from here to here." That the bone was shattered and there was a steel plate in his arm were, we think,

378

facts within the personal knowledge of Cook requiring no medical training to understand (see, *e.g.*, McCormick, Evidence §13, at 29 (2d ed. 1972)). Next, the spent shells found at the scene of the shooting were properly admitted as tending to prove that the offenses charged, attempt murder and aggravated battery, were committed in the tavern. It is no prerequisite to their admissibility that they be tied in some way to defendant. (See, *e.g., People v. Johnson,* 12 Ill. App. 3d 326, 297 N.E.2d 601 (5th Dist. 1973); *People v. Galloway,* 28 Ill. 2d 355, 129 N.E.2d 370 (1963).) Finally, we think that the evidence in the case did not justify the giving of an instruction on simple battery, and the court properly refused defendant's tendered instruction. See, *e.g., People v. Montgomery,* 18 Ill. App. 3d 828, 310 N.E.2d 760 (1st Dist. 1974).

The petition for rehearing is denied.

G. MORAN, J., concurs in the denial of the petition for rehearing, but does not agree with that part of the supplemental opinion concluding that the shells were properly admitted into evidence. In his opinion, this evidence was irrelevant.

CARTER, P. J., concurs.