THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES F. BUNDY, a/k/a Thomas Wade, Defendant-Appellant.

First District (2nd Division)   No. 78-970

Opinion filed December 11, 1979.

Ralph Ruebner and Susan Bandes, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Defendant Charles F. Bundy, a/k/a Thomas Wade, was found guilty of the June 30, 1974, murder of Konstantinos Florakos by a jury and sentenced to 60 to 70 years in the Illinois Department of Corrections. He appeals contending that the trial court erred (1) in denying his motion to suppress a statement allegedly made in contravention of his Sixth Amendment right to counsel (U.S. Const., amend. VI), and (2) in giving Illinois Pattern Jury Instructions, Criminal, No. 3.06 (1968) (hereinafter IPI Criminal). The following facts are pertinent to this appeal.

On June 30, 1974, Konstantinos Florakos (hereinafter "Dino") was a bartender working at the Medinah Restaurant and Lounge (hereinafter "the Medinah") located at 19 East Ohio, Chicago, Illinois.

Nick Piskunovs testified that on June 30, while waiting for a drink at the Medinah, Dino was tending bar, and that he saw a man identified at trial as the defendant leaning over the bar "hitting" Dino in the chest. The man ran out of the bar followed by a Mexican. The man who struck Dino had short blond hair, a shallow face, was about 5'3" tall, and weighed 120 pounds.

Earl Allen testified that on the night of the murder he was sitting in the first booth by the door at the Medinah when he saw the defendant enter and walk to the corner of the bar. According to Allen, Dino went to the corner of the bar, exchanged words with the defendant, and then went to the other end of the bar. When Dino returned, the defendant stabbed him once in the heart, said, "This is for your nigger friends," and then ran out the door. Allen ran after the defendant for about seven minutes but was unable to catch him. During the incident, Allen was able to see the defendant from distances of three and five feet and described the defendant as 5'9", weighing 125 pounds, having blond hair and a "real light complexion," and wearing a blue ski jacket and dark pants.

Eddie Helms, an employee of the Medinah, testified that on June 30, 1974, he was returning to the bar from the grocery store when he saw Dino trying to open the door to the bar. As Helms helped Dino open the door, blood from Dino's chest sprayed on him. Helms looked in the direction that Dino pointed and saw a man "duck off" into a parking lot

next door to the bar. Helms chased the man, whom he described as being 5'8" to 5'10" tall, a medium build, relatively short dishwater-blond hair, wearing dark clothing. Helms was not in the bar at the time of the stabbing and could not identify the offender, but testified that the defendant had been in the bar about 1 to 1½ hours before the stabbing.

Joseph Ghiotto testified that on June 30, 1974, he was sitting at the Medinah bar drinking when he saw the defendant enter the bar with a Mexican male. As the defendant stood at the bar about seven feet away, Ghiotto saw him pull a knife, lunge over the bar, and stab the bartender once in the chest as the defendant said, "This is for the niggers." The defendant then ran from the bar.

John Poulos testified that on June 30, 1974, at 12:30 a.m., he was across the street from the Medinah when he saw four or five people outside the bar. He then saw Dino as he came out of the bar holding his chest. Poulous ran to Dino who said, "They got me" and fell to the ground. Dino was taken to the hospital by taxi.

Officer Thomas Tranckitello testified that after going to Wesley Memorial Hospital on June 30, 1974, and learning that Dino had been stabbed at a bar at 19 East Ohio Street, he went to the scene where he took oral statements from eyewitnesses Earl Allen, Nick Piskunovs, and Joseph Ghiotto. These witnesses described the two men that they saw as a white male, 24 to 26 years old, 5'10", 145 pounds, blond hair, and a pockmarked face, and a male Mexican, 5', 125 pounds, and a thin muscular build. Tranckitello testified that none of the witnesses asserted that the Mexican had done the stabbing.

Officer John Toenings and Investigator William Baldree testified that Joseph Ghiotto and Nick Piskunovs later selected a photograph of Thomas Wade, also known as Charles Bundy, as the man who had stabbed Dino. Sergeant West Hunter testified that on July 5, 1974, the defendant was arrested as he entered a tavern, given his *Miranda* warnings, and turned over to Sergeant Rocco Rinaldi at the police station.

At the hearing on defendant's motion to suppress his statement, Officer Rocco Rinaldi testified that on July 5, 1974, at 8 p.m., he saw a man known to him as Thomas Wade at Area Six Homicide. He identified defendant Bundy as the man he saw. Officer Rinaldi advised defendant of his rights whereupon the defendant said that he understood them and did not want to talk until he spoke with an attorney. Officer Rinaldi ceased the conversation and returned to his desk 15 to 20 feet from where the defendant was seated.

About 10 to 15 minutes later, defendant Bundy asked Officer Rinaldi if he had found the woman on the north side who had died from an overdose. Officer Rinaldi asked defendant her name and defendant responded "Patricia Wade." Officer Rinaldi looked through some reports

and although he did not see her name, he was aware that an unknown female overdose victim had been found on the north side. Defendant then told Rinaldi that the victim was his wife. Rinaldi telephoned Officer Esmagde Christia who had been assigned to that death investigation and asked him to come to Area Six. Officer Rinaldi further testified that when Officer Christia arrived at the station, he briefly informed him of the events surrounding Bundy's custody, but he did not tell Christia that the defendant stated he intended to remain silent until speaking to an attorney.

Officer Esmagde Christia testified that on July 5, 1974, he first spoke with Officer Rinaldi and then with Wade. Only Officer Christia and Wade were present during their conversation. Officer Christia introduced himself to defendant and asked him his name and address. Defendant responded that his name was Wade and gave Christia his address. Christia then asked defendant what he had told Officer Rinaldi and defendant responded that there was an overdose victim on the north side on Kenmore Street who was his wife. Christia then asked for the exact address and defendant responded that it was in the 5500 block. Officer Christia testified that this was the same address as the woman whose death he had been assigned to investigate. Christia then asked the defendant what had happened. Defendant responded that he had registered at a hotel with his wife under the name Smith because she was intoxicated and had been using pills during the night. Christia then asked the defendant why he had used the name Smith. Defendant responded that he did so because the police were looking for him. Defendant further stated that he had fallen asleep that night and that the next morning he paid for another day's rent. During this conversation, defendant further stated that he returned to the hotel room and noticed that his wife was again taking pills and was in a stupor. According to Officer Christia's testimony, the defendant further stated that he then left for coffee, and upon his return found his wife passed out. Being unable to revive her, the defendant then informed the building manager that his wife had passed out and asked him to notify the police.

Christia further testified that when asked why he had not stayed with his wife, the defendant responded it was because the police were looking for him and he was afraid. The defendant then identified a photograph shown to him by Officer Christia as Patricia Wade, his wife. Officer Christia testified that he could not recall whether he gave defendant his *Miranda* warnings. Although Rinaldi had not told him, Christia concluded that defendant was in custody due to the handcuffs defendant was wearing. Christia later learned that the defendant had been charged with murder.

Following arguments on the defendant's motion to suppress his

statements that he had been attempting to hide from the police, the trial court found that, although Officer Christia had not given him his *Miranda* warnings, the conversation concerning the death of Patricia Wade was initiated by the defendant, and that his statements were not coerced. Accordingly, the trial court denied the defendant's motion to suppress the statements.

At the close of the trial, the trial court, over the defendant's objection, instructed the jury with IPI Criminal No. 3.06 as follows:

"You have before you evidence that the defendant made an admission of a fact relating to the crime charged in the indictment.

It is for you to determine whether the defendant made the admission, and, if so what weight should be given to the admission. In determining the weight to be given to an admission, you should consider all of the circumstances under which it was made."

Upon the jury finding the defendant guilty of the murder of Konstantinos Florakos, the defendant appeals.

## I.

Defendant first contends that Officer Christia's questioning after he had told Officer Rinaldi that he did not want to make any statements until he had talked to his attorney and the subsequent use of his statements violated his sixth amendment right to counsel. The State maintains that the defendant waived his right to counsel and volunteered the statements. ■■ In resolving this issue it is necessary to be mindful of the line of authority commencing with *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, in which the United States Supreme Court stated the requirement that once an individual in police custody requests the presence of an attorney, the interrogation must cease until an attorney is present (*Miranda*, 384 U.S. 436, 473-75, 16 L. Ed. 2d 694, 86 S. Ct. 1602). The United States Supreme Court later indicated that, once the person in custody has expressed a desire not to discuss the offense for which he was arrested, after a reasonable interval of time, the police may conduct an interrogation on an unrelated crime following a new recitation of the *Miranda* warnings. (*Michigan v. Mosley* (1975), 423 U.S. 96, 102-04, 46 L. Ed. 2d 313, 96 S. Ct. 321.) Illinois courts have distinguished the latter situation from cases in which the person in custody has requested the presence of counsel and the right to cut off questioning was not "scrupulously honored" because the interrogation was resumed with respect to the same crime and without the presence of counsel. See, *e.g.*, *People v. Washington* (1976), 41 Ill. App. 3d 475, 479-81, 354 N.E.2d 501, *aff'd* (1977), 68 Ill. 2d 186, 369 N.E.2d 57, *cert. denied* (1978), 435 U.S. 981, 56 L. Ed. 2d 72, 98 S. Ct. 1631; *People v. Parnell* (1975), 31 Ill. App. 3d 627, 628-30, 334 N.E.2d 403.

■■ However, the Illinois Supreme Court has also held that an in-custody confession by an accused was admissible where the accused initially indicated a desire to see a lawyer, but after the interrogation had stopped, stated that he did not want an attorney because an attorney might get him confused. (*People v. Morgan* (1977), 67 Ill. 2d 1, 3-7, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411.) Moreover, the *Mosley* court's reasoning which led it to reject any holding that a defendant who has invoked his right to silence "can never again be subjected to custodial interrogation by any police officer at any time or place *on any subject*" (emphasis added) (*Mosley*, 423 U.S. 96, 102, 46 L. Ed. 2d 313, 320, 96 S. Ct. 321, 325) has also been found applicable to cases wherein the defendant initially refuses to make a statement without the presence of counsel, but subsequently waives his right to the presence of counsel during questioning about an unrelated offense (see *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457, *cert. denied* (1976), 424 U.S. 970, 47 L. Ed. 2d 738, 96 S. Ct. 1469; *People v. Karr* (1979), 68 Ill. App. 3d 1040, 386 N.E.2d 927; *People v. Sanders* (1977), 55 Ill. App. 3d 178, 370 N.E.2d 1213).

In *White*, the defendant was arrested for an unrelated offense on May 24, 1969, and at that time the defendant told the police that he would prefer to talk to an attorney before talking to them. He was questioned about other offenses that afternoon and the next day and gave a confession to another incident. On May 26, 1969, he was questioned for the first time about the murder that was the basis for the conviction which the defendant was appealing. Prior to each interrogation the defendant was advised of his rights. At the conclusion of the interrogation on May 26, 1969, the defendant confessed to the murder. On appeal our supreme court held that the defendant's confession was properly admitted into evidence and affirmed the defendant's conviction. Obviously, the *White* court refused to hold that all interrogations of a defendant on any subject whatsoever after he has requested counsel are *per se* unlawful, and that any statement so obtained is inadmissible.

In *People v. Medina* (1978), 71 Ill. 2d 254, 375 N.E.2d 78, our supreme court again considered the waiver of the right to counsel during custodial interrogation. There, the 17-year-old defendant having no prior arrests or previous experience with the criminal justice system was taken into custody in the early morning hours, was advised of his rights and interrogated. When the defendant asked for counsel, the interrogation ceased. Four or five hours later at 8 a.m., the officers told him that several witnesses had accused him of the shooting. The defendant testified that the officers also told him that his silence in face of this accusation constituted an admission. The defendant thereafter admitted driving the car while another youth shot the victim and signed a written statement to that effect.

The supreme court affirmed the trial court's suppression of this statement. In doing so, the court first reiterated the *Miranda* court's absolute language prohibiting further interrogation after a request for counsel, and then went on to factually distinguish *Morgan* and *White*. As to *Morgan*, the court in *Medina* noted that there the defendant had volunteered to finish his statement. The *Medina* court further noted that in *White*, the issue had been viewed as a violation of the *Miranda* procedural safeguards, rather than a violation of the right to counsel, and that the effect of the violation of the procedural safeguards had been dissipated by the lapse of time and by the several *Miranda* admonitions.

Contrary to the defendant's contention, we do not believe that the supreme court in *Medina* retracted from its previous position that a defendant initially requesting the presence of counsel may subsequently waive that right. In fact the supreme court said: " 'Although we agree with the People that the right to counsel may be waived [citation], we conclude that the People did not meet the "heavy burden * * * to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained counsel." [Citation.]' " (71 Ill. 2d 254, 263.) Therefore, we must consider the facts in the instant case in light of the various factors delineated by the previous decisions.

■ At the outset, we note that Officer Christia must be charged with knowledge of the fact that the defendant had refused to talk to Officer Rinaldi in the absence of counsel regardless of whether or not he actually knew that fact. (See *Medina*, 71 Ill. 2d 254, 261; *White*, 61 Ill. 2d 288, 294.) Furthermore, it does not appear as though Officer Christia repeated the *Miranda* warnings prior to his questioning of the defendant. However, although repeated *Miranda* admonitions when coupled with a significant lapse of time may be found to dissipate an initial *Miranda* violation (*White*), it is not necessary to repeat the warnings at the beginning of each successive interview to avoid a *Miranda* violation. (See *People v. Hill* (1968), 39 Ill. 2d 125, 131-32, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305.) Moreover, although the defendant in the instant case did not, as in *Morgan*, expressly state that he did not want an attorney, as the supreme court stated in *People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195:

> "An express, formalistic waiver is unnecessary for '[a]ny clear manifestation of a desire to waive is sufficient. The test is the showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and circumstances.' [Citation.]" *Higgins*, 50 Ill. 2d 221, 227.

■ As in *White*, Officer Christia's questioning did not relate to the

offense for which the defendant was arrested; Officer Rinaldi had immediately ceased questioning about that offense when the defendant indicated his desire to speak to an attorney. Moreover, it was only when the defendant inquired about his wife's death about an hour after his initial request for counsel that Officer Christia was summoned to question the defendant, not about any offenses thought to have been committed by the defendant, but about the questions the defendant initially posed. Custodial interrogation was defined by the *Miranda* court as "questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of actions in any significant way." (*Miranda*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602.) (Emphasis added.) Justice Underwood, in a dissenting opinion in *People v. Washington*, expressed doubts whether there was a *Miranda* violation at all where it was the defendant, not the officers, who initiated the subsequent conversation pertaining to the crime for which the defendant was arrested after his request for an attorney. (*Washington*, 68 Ill. 2d 186, 195.) Unlike in *Medina*, the defendant in the instant case, based on the record before us, was not unfamiliar with the criminal justice system for he had been arrested several times previously. Nor were the defendant's statements in the instant case elicited in response to threats or accusations by the officers or by witnesses. Under these circumstances, we are of the opinion that the defendant clearly manifested a desire to waive his previous request for counsel, and that this waiver was the product of knowing, free, and intelligent choice. We think this is a simple situation of defendant voluntarily waiving his constitutional right by expressing his interest, and perhaps concern, in the condition of his wife, fully realizing what he was doing.

■■ Even assuming that the trial court's ruling on the defendant's motion to suppress was against the manifest weight of the evidence, there are circumstances in which a failure to comply fully with *Miranda* can be harmless. (*People v. Landgham* (1970), 122 Ill. App. 2d 9, 24, 257 N.E.2d 484, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389.) Errors of a constitutional nature can be regarded as harmless if beyond a reasonable doubt the error did not contribute to the finding of guilt. (*Chapman v. California* (1967), 386 U.S. 18, 23-24, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Smith* (1967), 38 Ill. 2d 13, 15, 230 N.E.2d 188.) When we say that the error did not contribute to the finding of guilt, we mean that the alleged erroneously admitted evidence did not prove an element of the crime not established by other properly admitted evidence. *Landgham*.

■■ The defendant does not contend in this appeal that he was not proved guilty of the murder of Konstantinos Florakos beyond a reasonable doubt. Thus, he does not dispute that the elements of that

crime were proved by the evidence which included the testimony of three eyewitnesses who identified the defendant as the offender. His statements made during Officer Christia's questioning were offered to show his flight from the police. Evidence of flight is admissible as a circumstance tending to show only consciousness of guilt. (*People v. Harris* (1972), 52 Ill. 2d 558, 561, 288 N.E.2d 385.) Therefore, his statements did not prove any elements of the crime not established by the other evidence. Under these circumstances, we are of the opinion that any error in the admission of the defendant's statements was harmless.

## II.

■ The defendant next contends that the trial court erred in giving IPI Criminal No. 3.06 because his statements were not admissions. He erroneously contends that an admission must prove an element of the crime for which he was charged. An admission has been defined as "any statement or conduct from which guilt of the crime may be inferred but from which guilt does not necessarily follow." (*People v. Stanton* (1959), 16 Ill. 2d 459, 466, 158 N.E.2d 47.) As noted previously, the defendant's statements that he did not return to the hotel and registered under the name Smith because the police were looking for him offered as evidence of the defendant's flight tended to prove his consciousness of guilt. The defendant does not argue, nor does the record show, that he attempted to hide from the police for any reason other than his consciousness of guilt of the offense for which he was convicted. (See *Harris*, 52 Ill. 2d 558, 561.) Under these circumstances, we are of the opinion that such statements described conduct from which guilt of the crime charged could be inferred.

Even assuming, *arguendo*, that the trial court erred in giving the admission instruction, reversal is inappropriate unless it can be said that the defendant was so prejudiced by the instruction as to affect the outcome of the verdict. (*People v. Kurzydlo* (1974), 23 Ill. App. 3d 791, 796, 320 N.E.2d 80.) Considering the clear and convincing evidence of the defendant's guilt, we find that giving the admission instruction, if error, was harmless. Based upon the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

PERLIN and HARTMAN, JJ., concur.