THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES N. PLEASANT, Defendant-Appellant.

Third District    No. 79-936

Opinion filed September 29, 1980.—Rehearing denied October 27, 1980.

STOUDER, J., dissenting.

Ronald E. Halliday, of Peoria, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

On May 15, 1979, the defendant, James N. Pleasant, was charged by indictment with one count of rape (Ill. Rev. Stat. 1977, ch. 38, par. 11—1(a)), and two counts of deviate sexual assault (Ill. Rev. Stat. 1977, ch. 38, par. 11—3(a)). Following a jury trial in the Circuit Court of Peoria County, he was convicted on all counts and sentenced to the Department of Corrections to serve concurrent terms of 25 years for each offense. On appeal, the defendant contends that the trial court erred in denying his motion to suppress his confession, and that prosecutorial misconduct, particularly alleged misstatements of an expert witness' testimony during closing argument, constituted reversible error. However, we do not consider the denial of defendant's motion to suppress to be error, nor do we hold the prosecutorial misconduct to be so prejudicial to the defendant that a reversal and a remandment for a new trial is necessitated. Accordingly, we affirm.

At approximately 8 p.m. on May 8, 1979, the victim, Terri Ernst, was washing the outside windows of a Hardee's Restaurant located on McClure Street in Peoria when a small brown car drove up and parked nearby. A man having curly brown hair and wearing a light shirt and dark pants got out of the car and walked across the street toward some houses. As Ms. Ernst finished washing the windows, someone came from behind her, grabbed her while holding a knife to her neck and told her to be quiet. Her assailant then proceeded to take Ms. Ernst behind the Hardee's, where he raped her and forced her to engage in deviate sexual conduct. During the assault Ms. Ernst recognized her assailant as the man she had earlier seen get out of the car, and at the trial identified the defendant, James N. Pleasant, as her attacker. Ms. Ernst testified that during the attack Pleasant told her that he was "a queer" and "asked me if I was a virgin and he told me that I wasn't, I was a whore."

After the attack, Ms. Ernst returned, partially clothed, to the Hardee's. At this time it was approximately 10:30. When she returned, Peoria police officer Gerald Ulrich was at the restaurant. After being informed that a brown car parked nearby could have been involved in the incident, he ran a check on the license number of the vehicle. He also observed a checkbook on the dashboard with Pleasant's name on it. Subsequently, Ulrich was joined by Officers Ron Theobald and Mike Bornsheuer. Ulrich instructed Theobald and Bornsheuer to stake out the vehicle.

Approximately 20 minutes after midnight Theobald observed the defendant enter the car and drive away. Theobald and Bornsheuer followed the defendant in a squad car, and stopped him in the vicinity of Loucks and McClure Streets. Theobald approached defendant's car, and asked the defendant for identification. At this time Theobald smelled the odor of alcohol on defendant's breath. Theobald then requested that Plea-

sant get out of his car, which the defendant did. Pleasant was then informed he was under arrest for rape, frisked, and handcuffed by Officer Theobald.

Police Officer Larry Layman arrived at the scene as Pleasant was getting out of his car pursuant to Theobald's request. After Pleasant was handcuffed, Layman read him his *Miranda* rights off of a card issued by the Peoria Police Department. Pleasant indicated to Layman that he understood his rights, and responded affirmatively to Layman's request to talk. At this time Layman asked the defendant his name, age, and address. Layman testified that he, too, smelled alcohol on defendant's breath. Afterwards he was placed in a paddy wagon and taken to the station.

Upon arrival at the station, the defendant was told to remove all of his clothing, which he did. Hair samples and combings were then taken. The defendant was subsequently taken to an interview room upstairs, where he again was read his *Miranda* rights by Officer Layman. At this time the defendant stated that he did not wish to speak. He did, however, agree to sign a consent for a blood sample. After signing the consent form, defendant was taken to St. Francis Hospital, where three blood samples were taken. The time was approximately 1:40 a.m. After the blood samples were taken the defendant returned to the police station with Officers Layman and Charles Cannon and placed in a holding cell.

Less than half an hour later Pleasant was taken from the holding cell to the interview room by Officer Cannon. The time was approximately 3 a.m. Cannon asked Pleasant "if he recalled the Miranda Warnings that Officer Layman had previously read to him." Pleasant stated that he did. Cannon then asked the defendant if he wanted to talk about the charges against him, and the defendant agreed to do so. Shortly thereafter the defendant made an oral confession followed by a written confession in which he admitted the rape and anal sexual contact with the victim. The written confession was taken at approximately 4:30 a.m., and was preceded by a recitation of Pleasant's *Miranda* rights. The defendant's motion to suppress his confession was denied, and our first concern on appeal will be the propriety of this ruling by the trial court.

■■ The defendant contends that his confession should have been suppressed because his right to remain silent was not "scrupulously honored" pursuant to the dictates of *Michigan v. Mosley* (1975), 423 U.S. 98, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326. *Mosley*, of course, stands for the proposition that a defendant's exercise of his right to remain silent does not permanently preclude subsequent interrogation by the authorities. Reinterrogation is permissible, and statements obtained thereby not rendered inadmissible by the operation of the exclusionary rule, if the interrogating officers scrupulously honor the exercise of the defendant's constitutional right not to speak.

■■ ■ In determining whether a defendant's right to remain silent was scrupulously honored, a number of factors must be examined. Two of the most crucial are whether there was a significant period of time, during which there was a complete cessation of questioning, between the defendant's exercise of his right to remain silent and the reinterrogation, and whether the reinterrogation was preceeded by a fresh set of *Miranda* warnings (*People v. Faison* (1979), 78 Ill. App. 3d 911, 397 N.E.2d 1233). "Additional circumstances which tend to demonstrate that the defendant's right to remain silent was scrupulously honored are that a different officer conducted the second questioning and that a completely different subject matter was involved in the second questioning" (*Faison,* 78 Ill. App. 3d 911, 913, 397 N.E.2d 1233, 1235). Most recently, in *People v. Savory* (1980), 82 Ill. App. 3d 767, 403 N.E.2d 118, this court found an additional factor tending to show the defendant's right to remain silent was not violated by the resumption of interrogation to be the presence of something in the record which would justify or explain the defendant's reconsideration of his decision to remain silent (but see *Savory,* Barry, J., dissenting).

■■ ■ Utilizing these factors, it is readily apparent that the defendant's right to remain silent was scrupulously honored, and that as a consequence his confession was not subject to suppression. After the defendant first asserted his right to remain silent, there was a complete cessation of questioning for approximately 1½ hours. Although the reinterrogation was not preceded by the recitation of a complete set of *Miranda* warnings, "it is not necessary to repeat the warnings at the beginning of each successive interview to avoid a *Miranda* violation." (*People v. Bundy* (1979), 79 Ill. App. 3d 127, 133, 398 N.E.2d 345, 350.) The constitution merely requires that prior to reinterrogation the defendant is given an opportunity to effectively exercise his rights. Here, the defendant was given such an opportunity when Officer Cannon asked him if he recalled the *Miranda* warnings previously given to him by Officer Layman. Certainly, the repetition of a complete set of *Miranda* warnings by the officer resuming the interrogation would be the preferable procedure. However, to find that anything other than the giving of a full set of *Miranda* warnings prior to reinterrogation is per se insufficient under *Mosley* is to incorrectly emphasize form over substance. Where, as here, a person in custody is asked prior to the initiation of reinterrogation if he recalls the *Miranda* rights that were given to him previously, and he expresses an understanding of those constitutional rights, he has been given an opportunity to "effectively exercise his rights at the outset of the second period of questioning" (*Faison,* 78 Ill. App. 3d 911, 913, 397 N.E.2d 1233, 1235) that is constitutionally satisfactory. Additionally, the reinterrogation was not performed by the same officer who conducted the previous interrogation,

and the taking of defendant's blood samples might explain his decision to waive his previously asserted right to silence. There is no evidence here that the interrogating officer, by resuming the interrogation, unconstitutionally infringed upon the defendant's right to remain silent, or that the defendant's confession was less than voluntary due to persistent and repeated efforts on the part of the police officers to wear down defendant's resistance and make him change his mind (compare *United States ex rel. Doss v. Bensinger* (7th Cir. 1972), 463 F.2d 576, *cert. denied* (1972), 409 U.S. 932, 34 L. Ed. 2d 186, 93 S. Ct. 239; *United States v. Crisp* (7th Cir. 1970), 435 F.2d 354; *People v. Gibson* (1977), 55 Ill. App. 3d 929, 371 N.E.2d 341). The motion to suppress the defendant's confession was properly denied.

The second contention of the defendant on appeal is that he was denied a fair trial as a result of a number of improper statements made by the Assistant State's Attorney during closing argument. The defendant first calls our attention to alleged misstatements by the Assistant State's Attorney regarding the testimony of Dr. Marvin Ziporyn, one of the defendant's expert witnesses. Dr. Ziporyn testified that the defendant was suffering from a specific mental disorder, *i.e.*, sociopathic personality disorder, sexual deviation. Dr. Ziporyn described the disorder's effect upon the defendant as follows:

"Now in Mr. Pleasant's case because of his early family experiences, he developed a tremendous preoccupation with sex and, and his entire life has been involved in an effort to keep from acting out the sexual desires and fantasies.

Basically you can say about Mr. Pleasant, that he is constantly in a state of sexual desire. He is constantly aroused, constantly compelled to cage his arouse [*sic*] and because of some of the experiences he has had in life he has become convinced that all women have foracious [*sic*] sexual appetites and basically welcome free and easy sexual contact.

Now he is not psychotic. He understands reality and so he understands that this is not an appropriate mode of social action. He knows the difference between right and wrong. He knows that there is not a direct posture to take.

But under any kind of stress his control over his desires breaks down and this sexual obsessiveness comes through and he commits acts of sexual elicitness. This is not a one-time thing with Mr. Pleasant. There is something that is ongoing because it is the result of a chronic mental disturbance. And when this occurs he is not able to control his actions because they are the result of his illness, that he cannot control his actions anymore than an individual with Tuberculosis can control a cough when it manifests itself or an individual

with a ulser [*sic*] can control himself from having a pain in his belly.

It comes because the disease calls for it and is not constant, but it comes forth under stress."

Dr. Ziporyn concluded his testimony on direct examination by stating that although the defendant is able to appreciate the criminality of his conduct, as a result of his mental disease he lacked the substantial capacity on the day of his attack upon Ms. Ernst to conform his conduct to the requirements of law. This, of course, is the legal definition of insanity found in section 6—2(a) of the Criminal Code (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(a)). Section 6—2(b) of the Criminal Code, however, provides that "[t]he terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(b).) The Assistant State's Attorney focused upon this latter section of the insanity statute during his cross-examination of Dr. Ziporyn, as evidenced by the following colloquy:

"Q. Now moving right on just for a minute, will you explain a little more clearly what you mean in simple terms by a person with socio-pathic behavior?

A. All right, an individual with socio-pathic behavior is an individual who has emotional problems which are manifested by acting out behavior. That is the basic concept and the acting out behavior is of such a nature as to involve the conflicts with the laws of the community in which he resides.

Q. So he is, Mr. Pleasant, according to your diagnosis has an emotional problem disease which is manifested by repeated criminal activity, I guess?

A. That is correct."

Subsequently, on redirect examination Dr. Ziporyn was asked by defendant's counsel if, in making his diagnosis of the defendant, he took into consideration the fact that a mental disease or defect does not include an abnormality that manifests itself only by repeated criminal or otherwise antisocial behavior. Dr. Ziporyn responded that he had taken it into account, but found it not to be pertinent because Pleasant was a sociopath with a sexual deviation based on emotional difficulties, not an antisocial personality. It is only the latter type of personality that is the subject of section 6—2(b) (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(b)). On re-cross-examination, the Assistant State's Attorney asked Dr. Ziporyn the following question:

"Q. Let me get this straight, doctor. Now, while the socio-pathic personality in sexual deviation is one whose soul [*sic*] manifestations are criminal behavior, activity which regards criminal behav-

ior, criminal sexual acts, you are making a distinction in your diagnosis based on the reasons behind that fact?

A. That is correct."

■■ During closing argument and rebuttal, the prosecutor stated that during his cross examination of Dr. Ziporyn, the doctor admitted that the defendant's abnormality was one which is manifested only by repeated criminal or otherwise antisocial behavior, and consequently it was not a mental disease or defect as defined in the insanity statute (Ill. Rev. Stat. 1977, ch. 38, par. 6—2). On appeal, the defendant contends that Dr. Ziporyn never testified to that effect, and the repeated misstatements of his testimony by the prosecutor were so prejudicial that he was denied a fair trial. (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898.) We disagree. In the last quoted colloquy between the prosecutor and Dr. Ziporyn, the prosecutor prefaced his question by stating that "sociopathic personality in sexual deviation is one whose soul [*sic*] manifestations are criminal behavior * * *." Although the doctor's answer is directly responsive to the prosecutor's inquiry, *i.e.*, whether he was making a distinction in his diagnosis, his response can be interpreted as a silent acquiescence in the prosecutor's basic premise. We consider the Assistant State's Attorney's comments to be a reasonable and legitimate inference to be drawn from Dr. Ziporyn's testimony, and therefore proper.

■■■ With regard to the other allegedly prejudicial comments made by the Assistant State's Attorney during closing argument, the record indicates either a cure of any prejudicial effect or a waiver of the objection on appeal. First, the defendant promptly objected to the prosecutor's statement that Dr. Ziporyn "was hired from Chicago to come down and diagnose the Defendant as insane, establish an insanity defense." This objection was sustained, and the jury was instructed to disregard the prosecutor's comment. Such action cured any error. (*People v. Hampton* (1969), 44 Ill. 2d 41, 253 N.E.2d 385.) Finally, the other two allegedly prejudicial remarks were not objected to by the defendant during closing argument. As a consequence any error was waived. *People v. Matthews* (1979), 69 Ill. App. 3d 65, 387 N.E.2d 10; *People v. Harris* (1975), 33 Ill. App. 3d 600, 338 N.E.2d 129.

The judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

STENGEL, J., concurs.

Mr. JUSTICE STOUDER, dissenting:

I respectfully dissent from the reasoning and the result reached by my colleagues. In my opinion the remarks of the prosecutor during his

final argument deprived the defendant of a fair trial, and consequently I believe a new trial should be granted to the defendant. The essence of Dr. Ziporyn's testimony was that the defendant was constantly in a state of sexual desire. Under stress his control over his desires breaks down and he commits sexual acts. He has no control over these actions because they are the result of a chronic mental disturbance. On cross-examination, Dr. Ziporyn stated that this disturbance is manifested by repeated criminal activity. On redirect examination he stated that he had taken into consideration the fact that the Illinois statute states that a mental disease or defect does not include an abnormality that manifests itself only by repeated criminal or otherwise antisocial behavior (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(b)) but found it not to be pertinent because defendant was a sociopath with a sexual deviation based on emotional difficulties, not an anti-social personality. It is only the latter type of personality that is the subject of section 6—2(b).

On re-cross-examination, the prosecutor asked Dr. Ziporyn:

"Q. Let me get this straight, doctor. Now, while the socio-pathic personality in sexual deviation is one whose soul [*sic*] manifestations are criminal behavior, activity which regards criminal behavior, criminal sexual acts, you are making a distinction in your diagnosis based on the reasons behind that fact?

A. That is correct."

On the basis of this testimony the prosecutor repeatedly stated during his closing argument and rebuttal that Dr. Ziporyn had testified that the particular abnormality from which the defendant suffers is manifested only by repeated criminal or otherwise antisocial behavior and therefore, the prosecutor stated, the defendant was not suffering from a mental disease or defect. Each time the prosecutor made these statements defense counsel objected that they were misstatements of Dr. Ziporyn's testimony, and the court cautioned the prosecutor to keep his comments to the evidence to a reasonable inference therefrom.

The majority contends the prosecutor's statements were a reasonable and legitimate inference to be drawn from Dr. Ziporyn's testimony. I find no basis for this contention. While Dr. Ziporyn did say that the defendant's emotional problem manifested itself in criminal activity, nowhere in the record does he state that it *only* manifested itself in criminal behavior. Nor can support for the prosecutor's statements be found in Dr. Ziporyn's answer to the question on re-cross-examination. The prosecutor prefaced the question by attempting to define sociopathic behavior and then asking Dr. Ziporyn if he was making a distinction from that in his diagnosis of the defendant. Dr. Ziporyn simply answered that yes, he was making a distinction. It does not logically follow that he accepted the prosecutor's premise that a sociopathic personality manifests itself solely by criminal

behavior. Nor can the idea that Dr. Ziporyn said that the defendant's illness was only manifested in criminal behavior be gleaned from that colloquy. In fact, the abovementioned colloquy, contrary to the majority's contention, is strongly supportive of the defendant's position. The most logical reading of the passage is that even if Dr. Ziporyn, for the sake of argument, accepted the prosecutor's premise, he would still say that the defendant was insane, as defined by the statute. Therefore, the conclusion can only be reached that the prosecutor seriously misstated the testimony supplied by Dr. Ziporyn.

It is indisputable that these misstatements prejudiced the defendant. They concerned the testimony of a key witness regarding defendant's sole defense. They were made repeatedly by the prosecutor. The defense of insanity is a very complicated one to present and difficult for a jury to understand. For the prosecutor to misrepresent the testimony of the defendant's key witness is indisputably prejudicial to defendant and requires a new trial.

Although the prosecutor's misstatements of Dr. Ziporyn's testimony in and of themselves require a new trial, I also believe it necessary to comment on one other instance of prosecutorial misconduct which aggravates the foregoing improper arguments. During closing argument the prosecutor stated that Dr. Ziporyn "was hired from Chicago to come down and diagnose the Defendant as insane, establish an insanity defense." The majority holds that because there was a prompt objection which was sustained and the jury was instructed to disregard the comment, any error was cured. I disagree. The statement was blatant misconduct which could serve no other purpose than to prejudice the jury. It was deliberate and inexcusable. In conjunction with the prosecutor's previous misconduct, it served to exacerbate the prejudice the defendant suffered. Because the prosecutor's misconduct was prejudicial to the defendant, I would reverse and remand for a new trial.