THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL K. CHURCH, Defendant-Appellant.

Fourth District    No. 16751

Opinion filed December 4, 1981.

156

Gary M. Neville, of Gomien, Maschine & Neville, Ltd., of Dwight, for appellant.

C. David Vogel, State's Attorney, of Pontiac (Robert J. Biderman and Larry Wechter, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

The defendant, Michael Church, was charged in a 41-count indictment with the murder of Randall May. The cause was tried before a jury simultaneously with the trial of his codefendant, Billy Joe Coffelt, for which a second jury was present in the same courtoom. Church's jury returned verdicts of guilty on all counts, but judgment was entered only on count I, murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)), and count XXXIV, armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2).

The defendant was sentenced to 40 years' imprisonment for murder and 40 years' imprisonment for armed violence, the sentences to be served concurrently. After defendant's motion for a new trial was denied, this appeal of the conviction and the sentences followed. Although we are chary about some of the procedures in this trial, and do not encourage their use, we affirm.

Since the defendant raises evidentiary and factual issues, a review of the facts, as elicited through testimony and evidence, is required.

On August 6, 1979, police, responding to calls of shots being fired in a

neighborhood, found the decedent, Randall May, lying on the backporch of the house next to what was later learned to be his residence. He was taken, by ambulance, to a hospital, where he died before he could name his assailants for the police.

Police investigators retraced May's bloody footprints to his apartment; as they did, several pieces of evidence (including a belt, a piece of teeshirt covered with blood, and a beer bottle) were found. Upon entering the house, police officers went into an apartment in which the television was on full volume. The police went into a livingroom-bedroom area of the apartment and found it to be in disarray with blood spattered about. They also found a broken beer bottle and a flashlight lying on the floor in pieces.

As a result of conversations with defendant's babysitter, Hazel Agne, warrants were obtained for the arrest of the defendant as well as that of his codefendant. Subsequently both were arrested. Defendant's two brothers were also arrested. Several items of evidence were obtained as a result of Coffelt's arrest which linked him to the crime. Defendant was arrested on August 10, 1979, on charges of aiding an escape and concealing and aiding a fugitive in connection with defendant's brother's and Coffelt's escape from a Tennessee prison. The defendant was advised of his *Miranda* rights at the time of his arrest and also while enroute to the squad car.

The public defender was appointed to represent the defendant. On August 11, 1979, Detective Arnold of the Pontiac Police Department spoke with the public defender by telephone indicating that he wished to speak with the defendant about a murder. The attorney instructed the detective to wait over the weekend until the following Monday.

Detective Arnold made no attempt to speak to defendant but was advised on the day after his conversation with the attorney that the defendant wished to speak to him. The defendant, his brother, in custody as a fugitive, Detective Arnold and Special Agent Lindsey met in an office at the Livingston County jail. Again defendant was advised of his *Miranda* rights. He stated he understood them and read and signed a waiver form.

Defendant was advised that he had an attorney and was specifically asked if he wanted him called. Defendant replied, "No. I want to give a statement." At no time, however, was defendant apprised of the detective's conversation with his attorney or his instructions that the police not question the defendant.

Church then started to give a verbal account, but the detectives stopped him. They gave him pen and paper and left him alone to write his statement.

In his statement defendant related that he had been invited to a picnic by Carol May, the victim's estranged wife, several days before the

murder. Carol had indicated to him that she wanted to talk to him about Randall May, with whom the defendant was acquainted. During the picnic with Carol and some of her friends a discussion occurred about May's parents' attempts to take Carol's child away from her. All present expressed the wish that Randall May die. Carol wanted to collect life insurance proceeds with which she could go to Washington to attend college. The defendant was also told that Randall May had accused him of being a homosexual.

Later in the afternoon, after going to Carol's friends' apartment, more discussion about Randall May's insurance followed. Carol and her friends talked about what they could do with the money. The defendant related that he told them he knew someone who could make Randall's death appear to be an accident.

Defendant went on to state that he then returned home and then to work. Later, he received a call from Randall May inviting him to his apartment. After leaving work Church picked up Coffelt and asked him if he wanted to meet Randall May. Coffelt said he did, so the two drove to May's apartment.

After some conversation at May's apartment Coffelt kicked May in the face, pulled a gun and threatened to kill him. Defendant related that Coffelt took May's motorcycle key from him while defendant looked on from a chair. Defendant then stood up and kicked May once. Coffelt then severely beat May in a brutal and degrading way.

Coffelt then ordered May to put his hands behind his back and told Church to tie them with May's belt. Coffelt, Church stated, devised a plan to burn May in his car. Coffelt then started downstairs with May following, and the defendant behind him holding the belt.

May bolted at the door and defendant began to run to his car. He heard several shots and soon thereafter Coffelt entered the car. They drove to defendant's trailer, where the defendant told his brother what had transpired. The defendant went into the bathroom and washed blood from his hands. At that point the defendant asked his babysitter to lie about the time he had arrived home. He also told her that Coffelt had killed someone and explained about the insurance money. Defendant stated that he did not know that these events were going to occur, but merely intended to introduce Coffelt to May.

Coffelt also gave a statement, but his statement implicated the defendant as the perpetrator of the crime.

A suppression hearing was held at which defendant contended that his statement did not follow a voluntary, intelligent, and knowing waiver of his fifth amendment rights. In denying the motion to suppress, the trial court held that the defendant had initiated the conversation with the police which resulted in his statement. The court noted that the defendant

had been admonished of his right to remain silent several times, had remained silent, but had later changed his mind.

The defendants then moved to consolidate their trials. The State objected to consolidation, citing problems which would arise under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. Defense counsel suggested that the court could deal with the statements either by a ruling on admissibility or a limiting instruction. The court granted consolidation.

The consolidated cases came on for trial and Coffelt moved to exclude the defendant's statement under the *Bruton* rule. The State then moved for reconsideration of the consolidation order. Defense counsel argued that he had prepared his case with an eye to the *Bruton* rule, although in this court he argues that this was not a prime consideration in his objection to severance. He also argued the likelihood that either defendant could be prejudiced if separate trials were ordered and one testified against the other.

The State then suggested a joint trial before two juries. The defense made a weak objection to this procedure and renewed the argument that severance would be prejudicial. However, defense counsel did indicate a preference to a two-jury trial over severance. Although the court expressed reservations, the judge agreed to the procedure because a second judge could not be found so that the cases could be heard separately but simultaneously. The trial court also agreed to the procedure for the reason that the defendants' statements could not be excised of the inculpating portions and remain meaningful.

The procedure which was agreed to, and followed, was that two juries would be chosen and seated in the same courtroom. When evidence was inadmissible as to one defendant, his jury would be removed from the courtroom and the evidence would be admitted for the other jury's consideration. The final arguments were also to be made only to the appropriate jury.

After the juries were selected, the trial court instructed them as to the procedure which would be followed. The defendants and their respective counsel were identified to the juries. The trial then proceeded with some minimal shuffling of juries.

The evidence at trial included Agne's testimony that defendant had admitted, several times, taking part in May's killing.

Carol May testified as to her marital difficulties with the decedent and her conversations with the defendant. During her testimony, before the Church jury only, she failed to recall statements she had made to defendant, which he had related in his statement, and to which she had testified at a grand jury hearing. The State requested that she be declared

a court's, or a hostile, witness, referring to the previous testimony in which her memory was more complete. Initially, the court denied the State's request, but after she displayed further lapses in memory, the court reversed itself and declared her a hostile or a court's witness. The court did not clarify on the record on which characterization it was relying. Mrs. May then affirmed her grand jury testimony, which essentially corroborated the defendant's version of the picnic and the attendant conversations.

On appeal, defendant raises numerous issues. Of those, three are of primary concern to us and we will address them first.

The defendant first contends that the trial court erred in refusing to suppress his statements. He argues that he did not make an effective waiver of his right to remain silent or his right to counsel. Further, defendant argues that he was denied effective assistance of counsel because his statement was not made in the presence of counsel. Conversely, the People contend that the defendant knowingly waived his rights. Moreover, it is argued that since the defendant initiated the conversation, there was no interrogation. The import of this argument is that without interrogation no question of waiver arises.

Notwithstanding the latter of the State's contentions, we hold that the defendant made an effective waiver of his right to remain silent and his right to have counsel present.

■■ We first turn to defendant's waiver of his right to have counsel present. Once counsel has been appointed, after indictment, an accused's statements made in the absence of counsel may not be used against him without his consent. (*Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199.) However, this does not mean, as defendant contends, that an accused may not waive substantive constitutional rights without the knowledge or consent of counsel. *Massiah* is not an absolute mandate barring all statements made by an accused outside the presence of counsel. *People v. Field* (1973), 13 Ill. App. 3d 74, 299 N.E.2d 754.

■■ There is no *per se* rule that once counsel is obtained, notice must be given him and his consent secured before the police may procure a written statement from his client. (*United States v. Springer* (7th Cir. 1972), 460 F.2d 1344.) The right to counsel is a personal one inhering in the accused and not the attorney; that retained counsel is not notified of his client's choice to forego assistance does not invalidate an otherwise valid waiver. *People v. Aldridge* (1980), 79 Ill. 2d 87, 402 N.E.2d 176.

■■ This does not mean that the mere existence of a statement given by an accused in the absence of counsel will always be admissible against him. Once counsel is appointed, the State has the burden of showing a voluntary waiver. (*Massiah*.) This is a heavy burden which requires a

showing by affirmative evidence that the defendant has waived his constitutional rights. *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.

The standard to be applied, which is a matter of Federal law, is that the State must prove an intentional relinquishment or abandonment of a known right or privilege. (*Brewer.*) This leads to the ineluctable conclusion that the knowledge the accused must have is of the existence of the right and not the invocation of it by his attorney. Thus, although in the instant case the defendant was not informed of his attorney's strategic decision that he not be questioned by the police, it is clear that he was aware of his right to have counsel present.

■■■ The inquiry does not end there, however. The right to counsel does not depend upon a request by the accused and the courts must indulge every reasonable presumption against waiver. Waiver of counsel requires not only a comprehension of the right but its relinquishment. (*Brewer.*) To relinquish the right, an express, formalistic waiver is not required. Any clear manifestation of a desire to waive is sufficient. (*People v. Bundy* (1979), 79 Ill. App. 3d 127, 398 N.E.2d 345.) The test for establishing this manifestation is that there must be a showing of intent to waive judged by the surrounding circumstances. *Bundy.*

■■ In the circumstances of the case at bar there is a clear manifestation of the intent to relinquish the right of which we have already determined the defendant was cognizant. The defendant was told counsel had been appointed. When asked if he wished counsel to be contacted, his reply was an emphatic negative. Although the defendant was not told of his attorney's instructions to the police, we cannot say that the defendant did not give up his right to have counsel present. Even where the accused has himself elected to speak through counsel, he is not powerless to countermand his election. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) We cannot accept the proposition that an accused must thus be rendered powerless to countermand the election when made by his attorney. It would be an absurdity to allow an accused to speak freely in one situation but not the other.

More important in determining the intent of the defendant are the circumstances under which he made his election. Here, he initiated the conversation in an apparent attempt to exculpate his younger brother who had been arrested with Coffelt but who had not been involved in the murder. Moreover, the defendant himself had been admonished of his rights several times, and it is clear from the record that he understood them. The testimony at trial, together with the tone of the defendant's own written statement, reveal that the defendant wished to make clear to the police the limited nature of his involvement. He came forth and made

his statement after refusing an offer to have counsel present. We can hardly imagine a set of circumstances more indicative of an intent to relinquish the right to have counsel present.

Although we do not approve of the police procedures utilized here, we do not find them constitutionally defective. We do not believe, contrary to defendant's testimony at the suppression hearing, that his decision would have been different had he known of counsel's instructions to the police.

■■ We also fail to find any constitutional infirmity in the defendant's waiver of his right to remain silent. There is no public policy requiring the police to affirmatively prevent or deter individuals from confessing that they have engaged in unlawful conduct. (*United States v. Drummond* (2d Cir. 1965), 354 F.2d 132 (*en banc*), *cert. denied* (1966), 384 U.S. 1013, 16 L. Ed. 2d 1031, 86 S. Ct. 1968.) Thus, there was no requirement when the defendant sought to give his statement that the police stop him from so doing. The clear admonishments given to defendant, his statement that he understood those rights, and his reading and signing of the waiver forms are indicative of knowledge of the right to remain silent and must be viewed, at least, as raising the presumption of a valid waiver. (Compare *United States v. Springer* (7th Cir. 1972), 460 F.2d 1344.) Defendant's words and his act of writing out his statement are sufficient evidence of an intent to relinquish a known right.

We would note in passing, although we do not rest our decision upon it, the State's contention that the waiver issue is not presented since there was no interrogation. The presence of interrogation, or its functional equivalent, focuses upon the perceptions of the suspect rather than the intent of the police. Arguably, Detective Arnold's lack of candor constitutes an action which he knew, or reasonably should have known, was likely to elicit an incriminating response, thus constituting interrogation. (*Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682.) However, interrogation must reflect a measure of compulsion above and beyond that inherent in custody itself. (*Innis.*) We do not believe that the actions of the police in the case at bar rise to the level of such compulsion. Moreover, it cannot be said that the actions of the police created a perception of interrogation in the defendant. However, even assuming, *arguendo*, that interrogation or its functional equivalent can be found, the right to counsel and to remain silent were adequately waived.

■■ We now turn to the next major issue: whether the trial of the two consolidated cases simultaneously before two juries in the same courtroom denied defendant due process of law and is not authorized by statute. Defendant is in the difficult position of having created this issue by insisting upon consolidation in an effort to rely on *Bruton* and avoid

prejudice which might have resulted from being tried after Coffelt. Yet he argues that he agreed to this procedure only as the least objectionable alternative.

While we agree that the defendant was faced with a dilemma, the same can be said of the State. More importantly, we recognize the dilemma faced by the trial court. Although we do not find the court's solution particularly attractive, we do not find it to be constitutionally defective.

The rule in *Bruton* is that in a joint trial where a codefendant does not testify the confrontation clause prohibits the introduction of his statement if it inculpates the other defendant since to do so would deny the right to cross-examine. This rule decidedly would favor the defendants in the instant case where both gave statements inculpating one another.

However, *Bruton* also held that the prosecution ought not be denied the benefit of a confession to prove the confessor's guilt if alternative ways may be found of achieving that benefit which do not infringe on the nonconfessor's right to confrontation. Thus, the mere fact that the two-jury procedure was adopted to avoid the impact of *Bruton* does not defeat its use. *United States v. Sidman* (9th Cir. 1972), 470 F.2d 1158.

Defendant's contention that there is no statutory authority for the two-jury joint trial is without merit. Section 115—4 of the Code of Criminal Procedure of 1963 contains no direct prohibition. (Ill. Rev. Stat. 1979, ch. 38, par. 115—4.) Moreover, we believe statutory authority for this procedure does exist.

Section 114—8 of the Code of Criminal Procedure of 1963 provides in pertinent part:

> "If it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants * * * the court may order separate trials, grant a severance of defendants, *or provide any other relief as justice may require*." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 114—8.)

This language is similar to that relied on by the Supreme Court of New Jersey in *State v. Corsi* (1981), 86 N.J. 172, 430 A.2d 210, in which that court approved a similar procedure.

It is not necessary, however, to look beyond our own jurisdiction to find approval of the two-jury joint trial. The supreme court has held that a joint trial with one defendant being tried by the court and the second by a jury did not deprive a defendant of due process. *People v. Pulaski* (1958), 15 Ill. 2d 291, 155 N.E.2d 29.

Moreover, where a defendant is given every opportunity to present a complete defense before one jury, cannot point to any event which confused the jury or affected its ability to render a decision fairly, and the record shows that the trial judge adequately prepared the jurors for the

procedure, the two-jury trial is acceptable. Absent a showing of prejudice, the reviewing court should not speculate as to any impropriety in the procedure. *People v. Smith* (1981), 94 Ill. App. 3d 969, 419 N.E.2d 404.

We find nothing in the instant case which indicates that defendant was prejudiced. Although he does point to one instance of confusion over an objection, it seemed to be more with counsel than with the court. This would no doubt have arisen whether there were one or two juries. Thus, the defendant has failed to establish prejudice.

The Federal Courts of Appeal have also approved the procedure. Although not giving it a blanket endorsement, the ninth circuit held that the procedure was not a constitutional violation. (*United States v. Sidman* (9th Cir. 1972), 470 F.2d 1158.) The procedure is seen as a form of partial severance under the Federal Rules of Criminal Procedure. (*United States v. Rowan* (6th Cir. 1975), 518 F.2d 685; *Sidman*.) Finally, where there is no confusion which is so pervasive as to render the trial unfair, even though moments of confusion appear in the record, the two-jury procedure has been endorsed. (*United States v. Rimar* (6th Cir. 1977), 558 F.2d 1271.) We hold that this form of partial severance is, at least implicitly, approved by section 114—8.

We now turn to the defendant's third major allegation of error. Defendant contends that the trial court erred in declaring Carol May a court's, or a hostile, witness when she expressed an inability to remember her grand jury testimony. While we agree that confusion existed, we find no error.

A review of the transcript reveals that the trial court ruled the witness to be hostile pursuant to Supreme Court Rule 238 (73 Ill. 2d R. 238) and called her as a witness of the court. Although the distinction between a court's witness and a hostile witness is a fine one, they are distinct.

■■ A proper foundation must be laid in order for a witness to be called as a court's witness. A party desiring the witness must state affirmatively the reasons why he cannot vouch for the witness. There must also be a shcwing that the testimony will relate to direct issues in the case. Finally, there must be a showing that the testimony is necessary to prevent a miscarriage of justice. The purpose of the procedure is to avoid a miscarriage of justice which may result without the testimony. *People v. Moriarity* (1966), 33 Ill. 2d 606, 213 N.E.2d 516.

■■ A court's witness may not be impeached by a prior inconsistent statement. Such impeachment goes only to the collateral issue of credibility, which violates the requirement that the examination relate only to direct issues. *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, 344 N.E.2d 611.

■■ ■ However, where a party is surprised by the testimony of an occurrence witness, he may be called as a hostile witness. Rule 238 allows

impeachment by inconsistent statement once the witness has been declared hostile. (*People v. Mager* (1976), 35 Ill. App. 3d 306, 341 N.E.2d 389.) This, together with the foundation requirement, delineates the distinction between the two categories.

■■ The proper course for the trial court would have been to call Mrs. May as a court's witness. She was not an occurrence witness, nor was her testimony surprising. The State had made an affirmative showing, by virtue of the grand jury testimony, that it could not vouch for her; this also satisfied the direct issue requirement. Since a sudden lack of memory will work a miscarriage of justice, the proper foundation has been laid. (Compare *People v. Morse* (1975), 33 Ill. App. 3d 384, 342 N.E.2d 307.) The use of the grand jury transcript is then refreshed recollection rather than impeachment since the witness testified merely that she could not recall.

■■ While criticizing the court's method, we will not disturb its ruling on the admissibility of her testimony. Where a trial court's admission of evidence is proper on some ground, it will not be disturbed even though the court gave the wrong reasons. *People v. Romero* (1975), 31 Ill. App. 3d 704, 334 N.E.2d 305, *aff'd* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

Defendant next contends that he was not proved guilty beyond a reasonable doubt because Agne's testimony of his admissions was effectively impeached and the other evidence merely established his presence at the scene of the crime. Thus, defendant argues that he was not proved guilty on an accountability theory.

A reviewing court must examine the evidence on appeal and, if it is found to be so improbable or unsatisfactory as to raise serious doubts about defendant's guilt, reverse the conviction. (*People v. Lindsey* (1979), 73 Ill. App. 3d 436, 392 N.E.2d 278.) We do not agree that this conviction must be reversed.

Agne's testimony was not effectively impeached. Although some minor inconsistencies in her testimony were elicited, they were not so contradictory with defendant's statements as to make her testimony improbable or unsatisfactory. Moreover, the contradictions did not dilute the evidence to palpable incredibility and improbability thereby raising a reasonable doubt as in *Lindsey*. The only major contradiction in this case is between the statements given by the defendant and Coffelt, and it should be remembered that Coffelt's statement was not placed before the jury.

We also hold that defendant's conviction on an accountability theory is adequately supported by the evidence. Section 5—2 of the Criminal Code of 1961 reads in pertinent part:

"A person is legally accountable for the conduct of another when:

* * *

(c) either *before* or *during* the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Emphasis added.) Ill. Rev. Stat. 1979, ch. 38, par. 5—2.

Defendant contends that mere presence coupled with flight will not satisfy the requirements of section 5—2. While this is undoubtedly correct (*People v. Lopez* (1979), 72 Ill. App. 3d 713, 391 N.E.2d 105), more is present in the instant case. Here the defendant's actions amounted to more than mere presence and rose to the level of active participation. The statute requires only some additional act before or during the crime and several acts during the crime are present here. Section 5—2 means that where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids. Conduct encompasses any criminal act done in furtherance of the planned or intended act. (*People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29.) Therefore, it is irrelevant whether defendant knew before going to May's apartment that Coffelt was to kill him. Once there, and aware of Coffelt's illegal acts, his acts in furtherance were enough to render him legally accountable under section 5—2.

Finally, we turn to defendant's contention that his concurrent sentences were excessive because the murder sentence was for the maximum term and the armed violence sentence for an extended term. A joint sentencing hearing was held for Church and Coffelt. Defendant argues that in sentencing him to the same sentence received by Coffelt, who did the shooting and had a worse criminal record, the trial court abused its discretion. The contention of error is that the trial court failed to account for these differences.

■■ The standard of review of sentences claimed to be excessive is whether, in fact, the trial court exercised its discretion and, if so, whether this discretion was abused. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

In the instant case the trial court noted the weak provocation which preceded the crime as well as the defendant's prior criminality. Moreover, the court felt that it was not likely that the defendant would comply with probation. The court also felt that the crime had been motivated by profit and that the small amount, $500, indicated a wantonness on the defendant's part. The court felt that a prison sentence was necessary to deter others from committing the crimes of murder and armed violence and that defendant's action, coupled with the evidence at trial, indicated that the crime had been committed in a cruel nature.

In sentencing the defendant to concurrent 40-year terms for murder

and armed violence, the trial court did not indicate whether these terms were imposed pursuant to section 5—8—1 or section 5—8—2, or both, of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—8—1, 1005—8—2).

Armed violence is a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 33A—3(a)), and the maximum term under section 5—8—1 for a Class X felony is 30 years. Thus it can only be assumed that the sentence of 40 years was imposed pursuant to section 5—8—2 as an extended term sentence. Such a term may not be imposed unless the factors in aggravation set out in section 5—5—3.2 are considered. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2.) A review of the transcript indicates that these factors were considered by the trial court and therefore an extended term does not violate the statutorily authorized sentences.

A 40-year term for murder could fall under either section 5—8—1 or section 5—8—2. Section 5—8—1(a)(1) allows a sentence of not less than 20 and not more than 40 years for murder. Section 5—8—2(a)(1) allows an extended term of not less than 40 and not more than 80 years for murder. Again, the factors in aggravation of section 5—5—3.2 were considered by the trial judge, thus permitting an extended-term sentence. On the other hand, the judge had the statutory authority to sentence merely for the maximum term of murder.

It is apparent from the record that the trial court exercised its discretion in sentencing both defendants. There appears nothing in the record which would indicate an abuse of discretion which would allow this court to reverse the trial court's sentence.


Affirmed.


GREEN, P. J., and LONDRIGAN, J., concur.